RIVERA, J.
On this appeal we must determine whether an indenture trustee may seek recovery on behalf of noteholders for defendants' alleged fraudulent redemptions intended to siphon off assets, leaving corporate obligors unable to pay the noteholders. The indenture at issue authorizes the trustee to "pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes," and thus empowers that trustee to proceed at law and in equity to recover losses incurred by all noteholders from the unpaid notes. As such, the trustee may assert causes of action to recover pro rata losses caused by defendants' scheme to render *194 **98 the note debtor insolvent. The trustee may also seek to pierce the corporate veil and impose corporate obligations on defendants under an alter ego theory of liability based on properly pleaded factual allegations-here that defendants created, for unlawful purposes, a corporate structure over which they exercised complete control and domination, and which they used to incur corporate debt so they could distribute the loan proceeds to themselves through fraudulent transfers, leaving the corporation unable to pay its creditors.
I. Procedural and Factual Background
The defendants on the appeal before us are private equity investment funds and their individual partners (collectively the private equity defendants) who are part of a consortium controlled by the global private equity groups Apax Partners, L.L.P. (Apax) and TPG Capital Management (TPG).[1] In 2005, these private equity defendants created a group of shell companies incorporated in Luxembourg to acquire TIM Hellas Telecommunications (TIM Hellas), which at the time was the third largest cellular telephone company in Greece, profitable and nearly debt-free. The multicompany corporate group of shell companies (Hellas Group) include Hellas Telecommunications, S.a`.r.l. (Hellas), the parent company of Hellas Telecommunications Finance, S.C.A. (Hellas Finance), Hellas Telecommunications I, S.a`.r.l. (Hellas I), and Hellas Telecommunications II, S.C.A. (Hellas II).[2]
By the end of 2005, the Hellas Group carried €1.6 billion in debt but only €38 million in equity and zero retained earnings.[3] The Hellas Group continued to borrow heavily, and by mid-2006 the Hellas Group's long-term debt had increased to almost €1.94 billion, as against shareholders' equity of €11.4 million. Notwithstanding this heavy debt to equity ratio, in December 2006, as part of Hellas Group's recapitalization, Hellas Finance issued €200 million in PIK (payment-in-kind) notes,[4] guaranteed by Hellas I, and governed *195 **99 by the indenture at issue in this case.[5] Simultaneously, as part of the recapitalization, Hellas redeemed convertible preferred equity certificates (certificates)[6] that had been held by the private equity defendants for approximately €973.7 million, which the private equity defendants pocketed.[7] Two months after the redemption of the Certificates, defendants sold the Hellas Group to an investor.
Less than three years later, during the global financial crisis in 2009, Hellas Finance and Hellas I defaulted on the PIK notes, leading to litigation to recover on behalf of the noteholders. Plaintiff Wilmington Trust Company (WTC), as the successor to the original indenture trustee,[8] brought the instant action against several Hellas entities and the private equity defendants to recover payment due on the PIK notes from the assets allegedly looted by defendants from Hellas Finance and Hellas I, including the €973.7 million in certificate redemptions.[9]
WTC claims that the recapitalization was not intended as a traditional restructuring of debt and equity, but in actuality was a scheme designed to distribute the loan proceeds to the private equity defendants by redeeming securities from the Hellas Group, including the certificates, and-in effect, paying out unlawful dividends-even though the Hellas Group was in considerable debt. The complaint alleges defendants adopted this scheme to "bleed-out" the Hellas Group, whereby:
"With an initial investment of €50 million, in 2005, TPG and Apax organized a group of interrelated companies to acquire a profitable, nearly debt-free company, then called Tim Hellas Telecommunications, S.A. ('TIM Hellas'), creating a complex multi-company group. Under the control of Apax and TPG, the newly formed Hellas entities borrowed heavily, paid the loan proceeds to Apax and TPG and their investment funds, and were left debt-laden *196 **100 and insolvent to the detriment of their creditors."
As against the private equity defendants, the complaint asserts causes of action for breach of contract, fraudulent conveyances, unlawful corporate distribution, and unjust enrichment.[10] In addition to the various causes of action to hold liable the parties named for their own conduct, the complaint further seeks to pierce the corporate veil on the theory that the private equity defendants are the alter egos of the Hellas Group and therefore liable for the corporate debt. For each cause of action, WTC requests payment of the €268 million owed on the PIK notes,[11] plus interest, trustee's fees, attorneys' fees, and the costs and disbursements of the action.
As relevant to this appeal, Supreme Court granted defendants' motion to dismiss the complaint, concluding that WTC lacked standing because the indenture did not permit the trustee to sue the private equity defendants for what the court considered "entirely separate claims" that could have been brought well before default ( Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a`.r.l., 47 Misc.3d 544, 569, 996 N.Y.S.2d 476 [Sup. Ct., New York County 2014] ). The court dismissed the cause of action based on the alter ego theory of liability for the same reason, but noted that, in any case, it was inadequately pleaded and duplicative of the fraudulent conveyance causes of action that the trustee is not authorized to maintain ( id. at 572 n 11 ).[12]
On WTC's appeal, the Appellate Division modified on the law and denied the motion to dismiss the complaint, insofar as asserted by WTC as indenture trustee, and otherwise affirmed the orders ( Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a`.r.l., 142 A.D.3d 833, 37 N.Y.S.3d 505 [1st Dept. 2016] ). The Court concluded that the relevant language of the indenture "confers standing on the trustee to pursue ... the fraudulent conveyance and other ... claims, which *197 seek recovery solely **101 of the amounts due under the notes, for the benefit of all noteholders on a pro rata basis, as a remedy for an alleged injury suffered ratably by all noteholders by reason of their status as noteholders" ( id. at 833-834 ). The Court also found that the complaint sufficiently states a cause of action against these defendants under a veil-piercing theory ( id. at 834 ).[13] The Appellate Division granted defendants leave to appeal and certified the question whether the court properly modified the order of Supreme Court. We answer that question in the affirmative.
II. Motion to Dismiss Standard of Review
"When reviewing a defendant's motion to dismiss a complaint for failure to state a cause of action, a court must give the complaint a liberal construction, accept the allegations as true and provide plaintiffs with the benefit of every favorable inference" ( Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc., 30 N.Y.3d 572, 582, 69 N.Y.S.3d 520, 92 N.E.3d 743 [2017] [internal quotation marks omitted] ). "Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" ( EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 19, 799 N.Y.S.2d 170, 832 N.E.2d 26 [2005] ). Furthermore, "[u]nlike on a motion for summary judgment where the court searches the record and assesses the sufficiency of the parties' evidence, on a motion to dismiss the court merely examines the adequacy of the pleadings" ( Davis v. Boeheim, 24 N.Y.3d 262, 268, 998 N.Y.S.2d 131, 22 N.E.3d 999 [2014] [internal quotation marks omitted] ). The complaint here sufficiently pleads causes of action against defendants, in accordance with the indenture, based on the alleged fraudulent transfer scheme and in support of WTC's request to pierce the corporate veil.
III. An Indenture Trustee's Role and Authority to Act on Behalf of Noteholders
"An indenture is essentially a written agreement that bestows legal title of the securities in a single Trustee to protect the interests of individual investors who may be numerous or unknown to each other" ( Quadrant Structured Prod. Co. v. Vertin, 23 N.Y.3d 549, 555, 992 N.Y.S.2d 687, 16 N.E.3d 1165 [2014] [citation omitted] ). As a partial solution to the collective-action problem presented by a fluctuating group of securities-holders with diverse interests, an indenture trustee "is appointed to act as a type of agent on behalf of the [securities-holders] collectively" (Steven L. Schwarcz & Gregory M. Sergi, Bond Defaults and the Dilemma of the Indenture Trustee, 59 Ala L Rev 1037, 1038 [2008] ). "[U]nlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement" ( Meckel v. Continental Res. Co., 758 F.2d 811, 816 [2d Cir.1985] ; cf. AG Capital Funding Partners, L.P. v. State St. Bank & Tr. Co., 11 N.Y.3d 146, 156, 866 N.Y.S.2d 578, 896 N.E.2d 61 [2008] [under corporate indenture, the rights of the trustee's pre-default duties are defined exclusively by the terms of the agreement] ). Therefore, to determine the trustee's authority to pursue *198 the causes of action in the appeal **102 before us, we look to the language of the indenture.
"[U]nder New York law[,] interpretation of indenture provisions is a matter of basic contract law" ( Quadrant, 23 N.Y.3d at 559, 992 N.Y.S.2d 687, 16 N.E.3d 1165 [internal quotation marks, brackets and citation omitted] ), and we construe an indenture subject to the rule that "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" ( id. at 559-560, 992 N.Y.S.2d 687, 16 N.E.3d 1165 ). "It is well established that when reviewing a contract, particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby" ( Kolbe v. Tibbetts, 22 N.Y.3d 344, 353, 980 N.Y.S.2d 903, 3 N.E.3d 1151 [2013] [internal quotation marks and brackets omitted] ). "A reading of the contract should not render any portion meaningless" ( Beal Sav. Bank v. Sommer, 8 N.Y.3d 318, 324, 834 N.Y.S.2d 44, 865 N.E.2d 1210 [2007] ). We now turn to the specific indenture language at issue here, and the scope of the trustee's authority to pursue the instant action against defendants to recover on the unpaid PIK notes.
IV. The Indenture's Trustee Authorization to Collect the PIK Note Debt
Indenture section 6.03, titled "Other Remedies," states, in relevant part: "If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture." Occurrences that would be considered an "Event of Default" are enumerated in section 6.01, and include a default in the payment of interest when due for 30 days, default in the payment of principal of any note when due at its maturity, and the failure by Hellas I or Hellas Finance to comply for 60 days after notice with its other agreements contained in the indenture.[14] Thus, by the terms of the agreement, the trustee is empowered to bring this third-party suit against the defendants in order to recover monies due and unpaid on the PIK notes.
The text of the indenture authorizes the trustee to pursue "any available remedy." This, by its terms, includes all remedies available at law and in equity. The indenture further provides that those remedies may be pursued "to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture." The plain meaning of section 6.03, then, is to authorize a trustee to pursue any lawful means of enforcing the noteholders' rights, against any individual or entity, based on any viable theory of recovery in order to secure repayment upon the event of a default on the debt to noteholders.
Interpreting "any available remedy to collect ... on the Notes" to include causes of action to recover noteholders' pro rata losses also gives effect to other sections of the indenture. Section 7.01(a) provides that a trustee in ''an Event of Default ... will exercise such of the rights and powers vested in it by the Indenture." Under section 4.01, an event of default includes *199 the failure of an issuer to "pay or cause to **103 be paid the principal of, premium, if any, and interest on, the Notes" as prescribed in the notes and the indenture. In such a case, the trustee may pursue any available remedy to collect the payment due, not for its own benefit or for some of the noteholders, but for all the noteholders, under a common claim of default (see Kolbe, 22 NY3d at 353, 980 N.Y.S.2d 903, 3 N.E.3d 1151 ).
Defendants argue section 6.03 should be read narrowly, so that a claim for payment "on the Notes" is construed to mean solely a claim for payment due "under the terms and conditions of the Notes." The trustee, they argue, is therefore not permitted to assert third-party actions based on defendants' alleged fraudulent conduct and may only bring claims against the parties who actually agreed to make payments on the PIK notes: the issuer and guarantor. Defendants' arguments are unsupported by law and the language of the indenture. The words actually used in the indenture are dispositive; not, as defendants would have it, a phrase found nowhere in the document (see Quadrant, 23 N.Y.3d at 559-560 ).
Nevertheless, defendants' assert that persuasive authority from other jurisdictions stands for the proposition that a trustee may not sue third parties in actions such as this one. A careful reading of the cases cited by defendants in support of its construction of section 6.03 makes clear that courts do not, in fact, limit the trustee in such way. Regions Bank v. Blount Parrish & Co., 2001 WL 726989 (N.D. Ill., June 27, 2001), heavily relied upon by defendants, is illustrative. Regions involved a remedies clause with almost identical language to that contained in section 6.03.[15] There, the court concluded that the clause did not give the trustee power to protect all rights of the bondholders or to pursue a bondholder's tort claims ( id. at *5 ). The case, however, turned on the nature of the specific claims at issue. The trustee in Regions brought a suit for fraudulent inducement-specifically, for misrepresentations and nondisclosures in the offering memorandum about the actual risks of the underlying technology in which the bondholders invested, and, as a consequence, the risk of entering the agreement-in violation of various provisions of the Securities Exchange Act (15 USC § 78a et seq.) and Illinois common law. Unlike the appeal here, Regions involved a pre-agreement fraudulent act to induce the bondholders' purchase. It could not have uniformly affected the bondholders' reliance when undertaking the investment. In contrast, WTC is not stepping into the shoes of particular noteholders to assert their claims, but rather seeking to remedy the post-agreement collective loss that springs from the issuer and guarantor's failures to satisfy payment of the PIK notes. In other words, the trustee is attempting to collect payments due on the notes. This difference is decisive.
WTC's fraudulent conveyance claim does not suffer from the flaw identified by Regions and other courts as a "carte blanche" to sue on common law and securities claims (see Regions, 2001 WL 726989 at *5, quoting Continental Bank, N.A. v. Caton DBLKM, Inc., 1990 WL 129452, at *5 [D Kan, Aug. 6, 1990] ). Those cases, also cited by defendants, similarly focus on fraudulent inducement and securities claims, rather than claims seeking recovery *200 of the actual monies the issuer was **104 obligated to pay on the notes, and are similarly distinguishable. In Continental Bank, the court held the indenture did not authorize a trustee to pursue an action against an underwriter for fraudulently representing a bond's financial condition and viability ( 1990 WL 129452, at *5 ). The court noted there was no "language giving the trustee the unrestricted authority to enforce any 'legal or equitable right' of the bondholders' " ( id. ). In Premier Bank v. Tierney, 114 F.Supp.2d 877, 881 (W.D. Mo. 2000), the court held that the trustee could not sue a director of the bonds' guarantor for negligence in failing to disclose the guarantor's true financial condition because "[n]o authority is conferred to pursue separate tort actions at all" (id. ). Moreover, even where a trustee seeks to pursue securities fraud claims, broad indenture language has been held to allow the trustee to bring suits like that at issue here (see In re Washington Pub. Power Supply Sys. Sec. Litig., 623 F.Supp. 1466, 1483 [W.D. Wash. 1985], affd 823 F.2d 1349 [9th Cir.1987] [where the indenture included a remedy provision granting the trustee broad authority, trustee had standing to assert fraud claims under Securities and Exchange Commission rule 10b-5 ( 17 CFR 240.10b-5 ) ]; Continental Bank, Nat. Ass'n v. Vill. of Ludlow, 777 F.Supp. 92, 97 [D. Mass. 1991] [same] ). The persuasive logic of these decisions supports our conclusion that section 6.03 empowers the trustee to pursue causes of action to remedy an injury common to all noteholders arising from the failure to pay the PIK note obligations.
We find unpersuasive defendants' argument that section 6.06 of the indenture-the "no-action clause"-supports its interpretation of section 6.03 and limits the trustee's power here. That clause provides, in relevant part, that in the event of default, the trustee is "under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any of the Holders unless such Holders have offered to the Trustee indemnity or security satisfactory to the Trustee against any loss, liability or expense'' (§ 6.06 [a] ). It also provides that noteholders may not pursue any remedy with respect to the indenture or the notes "[e]xcept to enforce the right to receive payment of principal, premium (if any) or interest when due,"[16] unless the noteholder has given notice to the trustee of default, noteholders having at least 25% of the outstanding notes have requested the trustee pursue the remedy, the noteholders have offered the trustee security or indemnity, the trustee has not complied with the request within 60 days after receiving the offer of security or indemnity, and the majority noteholders have not directed the trustee otherwise (id.). Defendants ignore the primary purpose of a no-action clause, which we have explained "is to protect issuers from the expense involved in defending individual lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors" ( Quadrant, 23 N.Y.3d at 565, 992 N.Y.S.2d 687, 16 N.E.3d 1165 [internal quotation marks, brackets and citation omitted] ). The inclusion of such a clause in an indenture "makes it more difficult for individual bondholders to bring suits that are unpopular with their fellow bondholders" ( id. at 566, 992 N.Y.S.2d 687, 16 N.E.3d 1165 [internal quotation marks, brackets and citation omitted] ). A no-action clause achieves these goals,
*201 **105 " 'by delegating the right to bring a suit enforcing rights of bondholders to the trustee, or to the holders of a substantial amount of bonds, and by delegating to the trustee the right to prosecute such a suit in the first instance. These clauses also ensure that the proceeds of any litigation actually prosecuted will be shared ratably by all bondholders' "
( Quadrant, 23 N.Y.3d at 566, 992 N.Y.S.2d 687, 16 N.E.3d 1165, citing Feldbaum v. McCrory Corp., 1992 WL 119095 at *6 (Del Ch, June 2, 1992)) ).
Here, the trustee's suit is in fact on behalf of all noteholders, and its proceeds will be distributed ratably. In other words, this suit upon default "is an attempt to secure payment, and resolution of the matter is of interest to the entire class of security holders" ( Quadrant, 23 N.Y.3d at 567 n 15, 992 N.Y.S.2d 687, 16 N.E.3d 1165 ).[17]
Contrary to defendants' argument, the analyses in Feldbaum v. McCrory Corp., 1992 WL 119095 (Del. Ch., June 2, 1992) and Lange v. Citibank, N.A., 2002 WL 2005728 (Del. Ch., Aug. 13, 2002) favor the trustee in this case. Feldbaum and Lange both interpreted a no-action clause in an indenture and held that the clauses prohibited individual security holders from asserting fraudulent conveyance claims on their own. The cases do not stand for the proposition, however, that such claims could not be brought by the indenture trustee. Quite the contrary. In Feldbaum, the court found that "[g]iven the derivative character of these claims, it is clear that they can be prosecuted by the trustees representing the bondholders as a group, provided the trustees are in a position in which they can represent plaintiffs fairly" ( 1992 WL 119095 at *8 ). In Lange the court went further, noting explicitly that, since the complaint sought "redress for harm suffered by all [holders] on a pro rata basis," it "may be pursued by the Indenture Trustee on their behalf" ( 2002 WL 2005728 at *7 ).
While the plain language of the indenture is dispositive, we also note that our construction of section 6.03 is in line with the intended meaning of nearly identical language from the Revised Model Simplified Indenture, also numbered section 6.03, and, given the similarities between the two, apparently the model for the agreement at issue in this case (see Revised Model Simplified Indenture, 55 Bus L 1115, 1137 [2000] ).[18] As the American Bar *202 **106 Association commentaries to the Revised Model Simplified Indenture explain: "In authorizing the Trustee to 'pursue any available remedy' for collection on the Securities or enforcement of the Indenture, the Model Simplified Indenture subsumes all of the customary phraseology: 'actions, suits or proceedings,' 'at law or in equity,' 'under this Indenture or otherwise by law,' etc." ( id. at 1189 ).[19] Significantly, the commentary observes that the language in section 6.03 "does not empower the Trustee to pursue claims which may be available to purchasers or sellers of Securities under state or federal securities law or the common law for misrepresentations inducing them to purchase or hold the securities" ( id. at 1190 ). As the commentary explains, these sorts of fraud claims may create conflicts for the trustee: first, fraud claims may be held by persons who no longer hold the securities and who sold after the fraud was discovered, as well as by those who still hold the securities; second, holders may have different rights depending on when they purchased and whether they can prove reliance on the fraud; third, recoveries by holders of fraud claims may prejudice collections by current holders; and fourth, securities fraud claims may be subordinated to other holders under bankruptcy laws ( id. at 1190 ). This rationale, although sound as applied to most claims related to securities fraud as, for example, under Securities Exchange Commission Rules rule 10b-5 for acts or omissions resulting in fraud or deceit in connection with the purchase or sale of securities, where individual noteholders will be in different positions and are best positioned to bring their own suits, has no purchase here. WTC seeks recovery solely of the amounts due under the notes, for the benefit of all noteholders on a pro rata basis, as a remedy for an injury suffered ratably by all noteholders by reason of the issuer and guarantor's default. Such action protects the collective interest of the noteholders in repayment of the PIK notes, without prioritizing one noteholder over another or placing a noteholder's rights at risk because of the actions of a minority of noteholders. As we noted in Quadrant,"parties sophisticated and well versed in this area of the law-like the parties here-are well aware of these commentaries" ( Quadrant, 23 N.Y.3d at 568, 992 N.Y.S.2d 687, 16 N.E.3d 1165 ).
For the preceding reasons, the language of section 6.03 of the indenture permits the kind of third-party action at issue here. If the parties to the indenture intended to limit the trustee to actions against the issuer and guarantor only-as defendants maintain-the signatories to the indenture could have easily said so. They did not. Therefore, WTC is empowered under section 6.03 to pursue causes of action to recover pro rata payment for all noteholders against those who WTC alleges bled dry the issuer and guarantor for defendants' profit, to the detriment of the noteholders.
V. Alter Ego Theory of Liability to Pierce the Corporate Veil
The complaint also asserts liability based on the theory that individual defendants acted as the alter egos of the issuer *203 **107 and guarantor, and caused those entities to divest the funds that would have otherwise been available to pay the notes. WTC thus seeks to persuade the court to pierce the corporate veil and impose corporate liability on these defendants. Defendants argue that the complaint is deficient because it fails to allege adequate facts, and in any event, WTC's claim should be dismissed as duplicative of the fraudulent conveyance causes of action that underlie WTC's alter ego theory. Defendants are wrong on both counts.
As discussed above, "[o]n a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction. We accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" ( Leon v. Martinez, 84 N.Y.2d 83, 87-88, 614 N.Y.S.2d 972, 638 N.E.2d 511 [1994] [citation omitted] ). Whether plaintiff can ultimately prove its allegations is not a consideration in determining a motion to dismiss (see EBC I, Inc., 5 N.Y.3d at 19, 799 N.Y.S.2d 170, 832 N.E.2d 26). Furthermore, a fact-laden claim to pierce the corporate veil is unsuited for resolution on a pre-answer, pre-discovery motion to dismiss (see e.g. Holme v. Global Minerals & Metals Corp., 22 Misc.3d 1123[A], 880 N.Y.S.2d 873 [Sup. Ct. New York County 2009], affd 63 A.D.3d 417, 879 N.Y.S.2d 453 [1st Dept. 2009] ). We are therefore acutely aware of the potential to decide the matter prematurely on a motion to dismiss.
"Broadly speaking, the courts will disregard the corporate form, or, to use accepted terminology, 'pierce the corporate veil', whenever necessary 'to prevent fraud or to achieve equity' " Morris v. Department of Taxation, 82 N.Y.2d 135, 140, 603 N.Y.S.2d 807, 623 N.E.2d 1157 [1993] [citation omitted] ). The party asserting this equitable doctrine, "seek[s] to go behind the corporate existence in order to circumvent the limited liability of the owners and to hold them liable for some underlying corporate obligation" ( id. at 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 ). Properly understood, "an attempt ... to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners" ( id. ).
"Generally, a plaintiff seeking to pierce the corporate veil must show that (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury" ( Conason v. Megan Holding, LLC, 25 N.Y.3d 1, 18, 29 N.E.3d 215 [2015] [internal quotation marks omitted]; see also TNS Holdings, Inc. v. MKI Sec. Corp., 92 N.Y.2d 335, 339, 680 N.Y.S.2d 891, 703 N.E.2d 749 [1998] [plaintiff bears "heavy burden of showing that the corporation was dominated as to the transaction attacked and that such domination was the instrument of fraud or otherwise resulted in wrongful or inequitable consequences"] ). At the pleading stage, "a plaintiff must do more than merely allege that [defendant] engaged in improper acts or acted in 'bad faith' while representing the corporation" ( East Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc., 16 N.Y.3d 775, 776, 919 N.Y.S.2d 496, 944 N.E.2d 1135 [2011] ). The plaintiff must adequately allege the existence of a corporate obligation and that defendant "exercised complete domination and control over the corporation and 'abused the privilege of doing business in the corporate form to perpetrate a wrong *204 **108 or injustice' " ( id., quoting Morris 82 N.Y.2d at 142, 603 N.Y.S.2d 807, 623 N.E.2d 1157 ).
Applying these principles here, we conclude that the complaint is sufficient and survives defendants' motion to dismiss. The complaint alleges Hellas Finance issued the PIK notes guaranteed by Hellas I, the noteholders purchased the notes for €200 million, then, after Hellas Finance and Hellas I failed to pay the amounts due under the notes, the trustee made demand for payment, and the amounts remain unpaid. These factual allegations are sufficient to support WTC's claim that Hellas Finance and Hellas I are liable for repayment plus interest. Having set forth the threshold corporate liability, the complaint must then allege "facts and circumstances which will persuade the court to impose the corporate obligation on its owners" ( Morris, 82 N.Y.2d at 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 ).
To meet this requirement, the complaint alleges that the private equity defendants owned and controlled Hellas, the parent company of Hellas I and Hellas Finance, and, as the alter egos of the issuer and guarantor, the private equity defendants had control and domination of the corporate form of the companies that defaulted on the PIK notes. The complaint further alleges that the private equity defendants misused the corporate form and describes a borrowing scheme that employed the Hellas Group shell companies to acquire long-term debt which dwarfed shareholder equity, all the while distributing the PIK loan proceeds and certificate redemptions to the private equity defendants. Critically, the complaint alleges these shell companies were created both to facilitate this flow of funds from the offering of the PIK and subordinated notes, and to conceal the true nature of these transactions from the noteholders (cf. TNS Holdings, 92 N.Y.2d at 339-340, 680 N.Y.S.2d 891, 703 N.E.2d 749 ["An inference of abuse does not arise ... where a corporation was formed for legal purposes or is engaged in legitimate business."]; see also Tap Holdings, LLC v. Orix Fin. Corp., 109 A.D.3d 167, 175, 970 N.Y.S.2d 178 [1st Dept. 2013] ["The mere fact that (the corporation) continues to operate as a legitimate automotive business should not relieve the Senior Lenders of liability when they are alleged to have caused the creation of the entity specifically to harm the note holders."] ). The consequence of these actions, according to the complaint, is that the scheme "forced" the Hellas corporations "to commit business suicide by paying borrowed funds to private equity defendants that the Hellas Defendants could not repay." The complaint describes the precarious financial status of the Hellas Group when the private equity defendants took the corporate assets for themselves, setting forth how and when the business acquired debt, and how that debt continued to grow despite the shareholders disproportionately low equity at the time. The complaint sets forth the alleged fraudulent conveyances, providing the dates and amounts of the PIK note proceeds and certificate redemptions distributed to the private equity defendants and their principals. These factual allegations, along with the reasonable inferences to be drawn therefrom, support a cause of action that Hellas Finance and Hellas I defaulted on payment to the noteholders because the private equity defendants used their control of the corporate form for the unlawful purpose of intentionally divesting the corporate assets through fraudulent conveyances, under the guise of dividends and redemptions, which in turn rendered these companies insolvent and unable to pay their creditors.
Defendants argue that the complaint is inadequate because it fails to plead with *205 **109 specificity the conduct alleged against each defendant that would support alter ego liability. While the complaint refers to the "Private Equity Defendants" throughout, the complaint also alleges various details about Apax- and TPG-affiliated entities, as well as the individuals that manage the funds that owned Hellas, which suggests a strong suspicion of fraud. It points to various individuals and entities tasked with directing Apax and TPG's day-to-day activities at the time of the fraudulent conveyances, it lists their titles and management positions, and it also identifies specific transferees of the fraudulent conveyance proceeds. It would be unreasonable to require greater detail from WTC as to each individual's daily conduct and involvement in the fraud at this pre-answer, pre-discovery stage (see Tap Holdings, 109 A.D.3d at 175, 970 N.Y.S.2d 178 [allegations against "Senior Lenders" adequate] ).
It is sufficient at the pleading stage that the alleged facts and the inferences drawn from them establish the basic elements of the doctrine of piercing the corporate veil: the individual defendants adopted the corporate scheme, created the corporate shells to further the scheme, misused the corporate form to commit a fraud that injured noteholders by defendants' decisions to issue debt in the form of the PIK notes, and distributed the loan proceeds and the certificates to themselves, with the known and intended result that Hellas I and Hellas Finance would be rendered insolvent and unable to pay the PIK note creditors.
Nor is the claim duplicative of the fraudulent conveyance causes of action. "The key to determining whether a claim is duplicative ... is discerning the essence of each claim" ( Johnson v. Proskauer Rose LLP, 129 A.D.3d 59, 68 [1st Dept. 2015] ). An argument to pierce the corporate veil is not a cause of action in itself, but rather dependent on the action against the corporation (see Morris, 82 N.Y.2d at 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 ). Since the complaint alleges the existence of a corporate debt, created by defendants by their use of the corporate form to profit from fraudulent conveyances that left Hellas I and Hellas Finance insolvent, WTC may request that the court pierce the corporate veil to impose liability upon defendants as the alter egos of Hellas I and Hellas Finance. WTC's demand is not duplicative of another cause of action, but rather a dependent legal theory WTC seeks to employ "to go behind the corporate existence in order to circumvent the limited liability of the owners and to hold them liable for some underlying corporate obligation" ( id. at 140-141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 ).
Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed, with costs, and the certified question answered in the affirmative.
Order, insofar as appealed from, affirmed, with costs, and certified question answered in the affirmative.
Chief Judge DiFiore and Judges Stein, Fahey, Wilson and Feinman concur.
Judge Garcia took no part.

This appeal pertains only to certain claims by plaintiff Wilmington Trust Company against the following defendants-appellants: Apax Partners L.P., Apax Partners Europe Managers Limited, Apax Europe VI GP Co. Ltd., Apax Europe VI GP, L.P., Apax Europe VI-A, L.P., Apax Europe VI-I, L.P., Troy L.P. Inc., Apax WW Nominees Ltd., Martin Halusa, John F. Megrue, Jr., and Giancarlo Aliberti, TPG Capital N.Y., Inc. (sued as TPG Capital-N.Y., LLP), TPG Partners IV, L.P., TPG Advisors IV, Inc., TPG GenPar IV, L.P., TPG Advisors II, Inc., T3 GenPar II, L.P., T3 Partners II, L.P., T3 Parallel II, L.P., TPG Troy LLC, T3 Troy LLC, David Bonderman, James Coulter, and Matthias Calice (collectively, defendants). Hellas Telecommunications Co-Invest Ltd.; Hellas Telecommunications Employees Ltd.; and Hellas Telecommunications II, S.C.A, who were named as defendants, are no longer parties to this action.

In the period relevant to this appeal, the private equity defendants owned all shares in Hellas, which is the 100% owner of Hellas I, which is the limited partner and majority owner of Hellas II and Hellas Finance. Hellas II is a 100% owner of various additional Hellas subsidiaries.

"€" refers to "euros."

"Deferred interest or payment-in-kind (PIK) notes are promissory notes issued by the borrower in lieu of cash payments of principal, interest, or both, that are due under the original note. PIK notes are likely to be issued by start-up companies, highly leveraged companies, or companies with tight, short-term cash flows. In these situations, the borrower may not have enough cash on hand to make interest payments. Rather, the borrower issues a note in a principal amount equal to the cash payment then due. Often, a loan agreement that contemplates the issuance of PIK notes will give the borrower the option to pay the interest when due in cash or to execute such a note in the amount equal to the past due principal or interest" (Richard W. Grice & Rick D. Blumen, Georgia's Usury Laws and Interest on Interest: The Need to Transcend the Nineteenth Century, 8 Ga St U L Rev 291, 309 [1992] ).

Simultaneously with the issuance of the PIK notes, Hellas II issued subordinated notes. Plaintiff alleged Hellas borrowed approximately €1.5 billion in total, which included issuance of the PIK notes and the subordinated notes of Hellas II.

"PECs (preferred equity certificates) or CPECs (convertible preferred equity certificates) are hybrid financial instruments that are typically used in a cross-border context to finance Luxembourg holding companies. Under Luxembourg tax law, these instruments qualify as debt for capital duty and for corporate income tax and net wealth tax purposes. Consequently, payments or accruals made under the PECs or CPECs are, similar to interest payments, deductible from the tax base of the Luxembourg entity and are exempt from withholding tax" (New York State Bar Association, Tax Section, Employee Benefits Committee, Report on Rules Governing Nonqualified Deferred Compensation Under Section 457A at 71 n 160 [Oct. 5, 2009] ).

The complaint alleges that Hellas II redeemed 27.3 million CPECs issued to and held by Hellas I for €979 million, that Hellas I redeemed 27.4 million CPECs issued to and held by Hellas for €973.7 million, and that Hellas redeemed 27.4 million CPECs issued to and held by the private equity defendants for €973,657,610. It also alleges Hellas redeemed PECs issued to and held by the private equity defendants for approximately €211 million. Plaintiffs allege the total payments to the private equity defendants were over €1.185 billion. Hellas reported €946,284,610 of the payments as a dividend to shareholders.

The original trustee was The Bank of New York.

The dismissal of co-plaintiff, Cortlandt Street Recovery Corporation, is not at issue on this appeal (Cortlandt St. Recovery Corp. v. Hellas Telecom., S.à.r.l., 47 Misc.3d 544, 996 N.Y.S.2d 476 [2014] ). After WTC filed the instant matter, it secured a $565 million judgment in another action against Hellas Finance and Hellas I, as issuer and guarantor respectively, upon those defendants' default.

The complaint asserted 10 causes of action in total. The first cause of action is against Hellas Finance, Hellas I, and Hellas for payment of PIK notes. The fourth and tenth are against the private equity defendants as alter egos for payment of the PIK notes and for unjust enrichment and imposition of a constructive trust. The remaining causes of action are against all defendants for breach of contract, violation on prohibitions on distributions, for conveyances by insolvents, conveyances by persons in business, conveyances made with intent to incur debt beyond the ability to pay, intentional fraudulent conveyances, and conveyances of partnership property. All of the conveyance claims are based on New York's Debtor and Creditor Law (§§ 273 -277 ).

The complaint alleges this is the principal amount due on the PIK notes as of November 27, 2009-the date on which the original trustee issued a notice of event of default due to the commencement of an insolvency proceeding by Hellas II. On the tenth cause of action against the private equity defendants for unjust enrichment, plaintiff seeks imposition of a constructive trust as well as an order to disgorge the €268 million plus interest, fees, and costs.

In its order, Supreme Court addressed four related matters (Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a`.r.l., 47 Misc.3d 544, 547-550, 996 N.Y.S.2d 476 [Sup. Ct., New York County 2014] ): first, "Cortlandt I," commenced solely by Cortlandt suing as assignee and agent of collection of approximately €102 million of PIK notes (Index No. 651693/10); second, "Cortlandt II," the instant action by the trustee (Index No. 653357/11); third, a motion for summary judgment in lieu of complaint involving the same PIK notes as the previous two actions (Index No. 653363/11); and fourth, an action on the subordinated notes brought by Cortlandt against Hellas II, as well as the other Hellas and Apax/TPG entities (Index No. 653181/11). Supreme Court also dismissed the complaint in Cortlandt I, as well as the subordinated notes action (id. at 555 ).

The merits of defendant's alternative grounds for dismissal raised before Supreme Court were not briefed by defendants to the Appellate Division nor on this appeal. They were not addressed by the Appellate Division (Cortlandt, 142 A.D.3d at 834 n. 2, 37 N.Y.S.3d 505).

Section 6.02 of the indenture also provides for acceleration of payment as a remedy for an event of default. It authorizes the trustee and noteholders of at least 25% in aggregate principal amount of the then outstanding notes to declare immediately due and payable the principal and unpaid, accrued interest on the notes.

"If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy by proceeding at law or in equity to collect the principal of, premium, if any, or interest on the Bonds or to enforce the performance of any provision of the Bonds, this Indenture, the Facility Lease Agreement or the Guaranty" (2001 WL 726989, at *2 ).

This provision does not contain the "any available remedy" language found in section 6.03 of the indenture at issue on this appeal.

Defendants' references to other sections of the indenture to support its argument against WTC's standing in this case fare no better. The language in section 14.07 of the indenture, namely, "for any claim based on, in respect of, or by reason of such obligations or their creation" is an addition to the language that states there is no liability for the notes-evincing that the first provision is on the notes, which is exactly what the plaintiff pursues here. The same is true of section 14.09. All that these provisions establish is that the parties included language for claims that are not for recovery triggered by an event of default. Here, the action is in response to and for recovery on an event of default, i.e., the failure to pay the debt on the notes.

Section 6.03 of the Revised Model Simplified Indenture reads: "If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of Principal or interest on the Securities or to enforce the performance of any provision of the Securities or this Indenture" (55 Bus Law at 1137 ). The corresponding passage in the prior 1965 model indenture reads
, "[i]f an Event of Default occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Debentureholders by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy" (American Bar Foundation, Commentaries on Model Debenture Indenture Provisions § 5.3 at 224 [1971] ).

Without the customary language subsumed, the provision would read:
"If an Event of Default occurs and is continuing, the Trustee may pursue actions, suits or proceedings at law or in equity under this Indenture or otherwise by law to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture."