Zollo v Adirondack Lodges Homeowners Assn., Inc. (2024 NY Slip Op 01225)

Zollo v Adirondack Lodges Homeowners Assn., Inc.

2024 NY Slip Op 01225

Decided on March 7, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:March 7, 2024

CV-22-2334
[*1]John B. Zollo et al., at least 5% of the members of the Adirondack Lodges Homeowners Association, Inc., and in the Right of the Adirondack Lodges Homeowners Association, Inc., and on Behalf of Other Members Similarly Situated, Appellants,
v
Adirondack Lodges Homeowners Association, Inc., et al., Respondents.

Calendar Date:January 16, 2024

Before:Garry, P.J., Egan Jr., Aarons, Reynolds Fitzgerald and McShan, JJ.

Law Offices of John B. Zollo PC, Smithtown (John B. Zollo of counsel), for appellants.
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Albany (Christopher A. Priore of counsel), for respondents.

Garry, P.J.
Appeal from an order of the Supreme Court (Robert J. Muller, J.), entered December 1, 2022 in Warren County, which, among other things, granted defendants' motion for summary judgment dismissing the complaint.
Defendant Adirondack Lodges Homeowners Association, Inc. is a residential community of 54 townhouse units and 24 single-family units located on Schroon Lake.[FN1] The Association is governed by a restated declaration, as well as a set of bylaws, and is managed by defendant Adirondack Lodges Homeowners Association Board of Directors, (hereinafter the Board), consisting of elected owners who serve limited terms without compensation. The declaration guarantees each unit boat docking rights, and, to fulfill that obligation, the Association owns and maintains three docking facilities. Two of the facilities, hosting a total of 26 slips, are located directly on the lake. The subject of this dispute is the third facility, a human-made harbor with slips for 52 boats that is connected to the lake proper via a tributary. It is undisputed that, by 2018, the harbor was in disrepair and its retaining walls were collapsing. In 2019, the Board received proposals from engineering firms for restoration of the harbor. The Board approved one such proposal, and, at an October 2019 open meeting, the Board heard the firm's findings and recommendations, including that the harbor was beyond repair and would cost $1.2 million to replace. The Board then adopted a resolution to include in the Association's 2020 budget an assessment in the amount of $3,500 per unit to partially fund a reserve for the eventual replacement of the harbor. The Board issued the assessment in May 2020 as a "[m]aintenance [a]ssessment."
Plaintiffs, owners of certain properties within the Association, commenced this action thereafter seeking a judgment declaring the assessment invalid and imposing related injunctive relief. In plaintiffs' view, the assessment constituted a "[s]pecial [a]ssessment" within the meaning of the declaration, rather than a maintenance assessment, and, given its amount, the special assessment was subject to an owner vote, which had not occurred. Plaintiffs also set forth several claims regarding the Board's alleged breach of its fiduciary duties, seeking millions of dollars in monetary damages. Defendants joined issue and counterclaimed to enforce the assessment, impose a lien upon plaintiffs' properties and obtain an award of counsel fees. Following certain other motion practice, plaintiffs moved for summary judgment as to their declaratory and injunctive causes of action. Defendants opposed and cross-moved for summary judgment dismissing the complaint and granting their counterclaims. Supreme Court granted defendants' cross-motion in full, concluding, in pertinent part, that the Board's interpretation of the declaration is entitled to deference under the business judgment rule. Plaintiffs appeal.
We agree with plaintiffs that the deference owed to the Board is with regard [*2]to its decision to replace the harbor and how to best fund that replacement, not its interpretation of its own authority to issue the subject assessment in the manner that it did. Whether a governing board acted within the scope of its authority, as provided for by the governing documents, is instead a threshold question subject to judicial scrutiny (see Katz v Board of Mgrs. of Stirling Cove Condominium Assn., 201 AD3d 634, 636 [2d Dept 2022]; Laker v Association of Prop. Owners of Sleepy Hollow Lake, Inc., 172 AD3d 1660, 1662-1663 [3d Dept 2019]; Pomerance v McGrath, 124 AD3d 481, 483 [1st Dept 2015], lv dismissed 25 NY3d 1038 [2015]; Yusin v Saddle Lakes Home Owners Assn., Inc., 73 AD3d 1168, 1170-1171 [2d Dept 2010]). Where a board's action was authorized and taken in good faith to further a legitimate interest of the association, it is the soundness of its management decision that is protected by the business judgment rule (see Baxter St. Condominium v LPS Baxter Holding Co., LLC, 205 AD3d 640, 641-642 [1st Dept 2022]; Katz v Board of Mgrs. of Stirling Cove Condominium Assn., 201 AD3d at 636; Helmer v Comito, 61 AD3d 635, 636-637 [2d Dept 2009]; see generally Matter of Levandusky v One Fifth Ave. Apt. Corp., 75 NY2d 530, 537 [1990]).
Turning to the question of authority, our review and analysis of the declaration is governed by well-settled principles of contract interpretation (see Matter of Olszewski v Cannon Point Assn., Inc., 148 AD3d 1306, 1308-1309 [3d Dept 2017]; see also Weiss v Bretton Woods Condominium II, 151 AD3d 905, 906 [2d Dept 2017]). The determination as to whether a contract is ambiguous and the interpretation of an unambiguous agreement are questions of law for the court to resolve (see W.W.W. Assoc., Inc. v Giancontieri, 77 NY2d 157, 162 [1990]; Goldman v Emerald Green Prop. Owners Assn., Inc., 116 AD3d 1279, 1280 [3d Dept 2014]). In making these determinations, "[t]he court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought" (Atwater & Co. v Panama R.R. Co., 246 NY 519, 524 [1927]; see White Knight Constr. Contrs., LLC v Haugh,216 AD3d 1345, 1347-1348 [3d Dept 2023]). "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion" (Greenfield v Philles Records, 98 NY2d 562, 569 [2002] [internal quotation marks, brackets and citation omitted]; see Donohue v Cuomo, 38 NY3d 1, 13 [2022]). "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or [*3]when specific language is susceptible of two reasonable interpretations" (Ellington v EMI Music, Inc., 24 NY3d 239, 244 [2014] [internal quotation marks and citations omitted]; see Universal Am. Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa., 25 NY3d 675, 680 [2015]). It is of course axiomatic that "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (Greenfield v Philles Records, 98 NY2d at 569; see Cortlandt St. Recovery Corp. v Bonderman, 31 NY3d 30, 39 [2018]).
Reading the declaration as a whole, we find no ambiguity. Initially, the declaration imposes a duty upon the Association "to preserve and enhance the values and amenities of the [p]roperty" by "maintain[ing] the [p]roperty, and all other facilities of the Association" "at all times."[FN2] To that end, declaration section 5.02 requires the Board to fix and determine an annual budget for the Association, necessitating that the Board "determine the total amount required, including the operational items such as insurance, repairs, reserves, maintenance and other operating expenses, as well as charges to cover any deficits from prior years and capital improvements approved by the Board." Conversely, each owner of any unit, by acceptance of a deed therefor, has a duty to pay the Association "[a]nnual [a]ssessments of charges for the maintenance and operation of the [p]roperty" and "[s]pecial assessments for capital improvements."[FN3] "Maintenance [a]ssessments" and "[s]pecial [a]ssessments" are collectively referred in the declaration to as "[a]ssessments." [FN4]
Declaration section 5.03 addresses the "[p]urpose of [a]ssessments," and provides that "[t]he purpose of the [m]aintenance [a]ssessments shall be to fund the maintenance, repair, replacement and improvement of the [p]roperty and the promotion of the recreation, safety and welfare of the [o]wners, including but not limited to," as identified by section 5.03 (d), "[t]he facilities included in [declaration] [s]ection 6.01 . . . (except those excluded by such [s]ection or any other [s]ection [of the declaration])."[FN5] Section 6.01, providing what repairs and maintenance are the responsibility of the Association, expressly includes the harbor: "[e]xcept as specifically otherwise provided in this [s]ection . . . , all maintenance, repair and replacement of the [b]uildings[,] . . . roadways, walkways, signage, if any, septic and water systems, tennis courts, beach, harbour and all property up to the exterior foundations of the [u]nits, and the exterior of the [t]ownhouse [u]nits . . . shall be the responsibility of, and, at the expense of, the Association" (emphasis added).
Declaration section 5.06 addresses "[s]pecial [a]ssessments for [c]apital [i]mprovements" and provides that, "[i]n addition to the annual [m]aintenance [a]ssessment, the Association may levy a [s]pecial [a]ssessment for the purpose of defraying, in whole or in part, the cost of any capital improvements[*4], including without limitation, the construction, reconstruction, replacement or repair of a capital nature to the [p]roperty, including the necessary fixtures and personal property related thereto."[FN6] There are two instances in which a special assessment requires the consent of the owners, by a supermajority vote of 60%: (1) "[a]ny [s]pecial [a]ssessment for the construction (rather than reconstruction or replacement[)] of any capital improvement" and (2) "any [s]pecial [a]ssessment amounting to more than [25%] of the then current amount of annual [m]aintenance [a]ssessments."
Read together, declaration sections 5.03 (d) and 6.01 expressly authorize — and indeed mandate — the use of maintenance assessments to pay for repair and replacement of the harbor. Contrary to plaintiffs' reading, section 5.06 does not establish that an assessment amounting to more than 25% of that year's maintenance assessment is definitionally a special assessment; that provision instead provides only the circumstances when a special assessment is subject to a vote. Section 5.03 (d), by reference to section 6.01, and section 5.06 both contemplate the respective types of assessments funding maintenance and capital improvements. The sensible reading of these provisions together is that section 5.06 special assessments are intended to fund capital improvements not listed in 6.01 (a). To hold otherwise would render the 5.03 (d)'s incorporation of section 6.01 and 6.01's inclusion of harbor maintenance, repair and replacement meaningless (see generally Beal Sav. Bank v Sommer, 8 NY3d 318, 324 [2007]). To the extent that any conflict between these authorizing provisions may arguably be found to exist, we would further find that the more specific language of sections 5.03 and 6.01 must control (see generally Muzak Corp. v Hotel Taft Corp., 1 NY2d 42, 46 [1956]). Additionally, in view of the Association's explicit duty to maintain the harbor, among other assets of a capital nature, plaintiffs' reading would ostensibly nullify the declaration's general purpose (see generally Matter of Olszewski v Cannon Point Assn., Inc., 148 AD3d at 1309) — leaving the Board with no practical means to satisfy its duty in light of the significant number of owners eligible to vote on the would-be special assessment who do not directly benefit from the harbor.
In view of the foregoing, defendants established prima facie entitlement to judgment as a matter of law with respect to the issue of authority, and plaintiffs failed to raise an issue of fact as to same. Plaintiffs are not challenging the legitimacy of the harbor replacement or the Association's good faith. Accordingly, we find that defendants' motion was properly granted. Given our disposition, plaintiffs' request for counsel fees also fails. Defendants also request an award of counsel fees attendant to this appeal. Supreme Court has already granted defendants' counterclaim for counsel fees under the terms of the declaration. The totality of [*5]counsel fees requested may be presented to Supreme Court.
Egan Jr., Aarons, Reynolds Fitzgerald and McShan, JJ., concur.
ORDERED that the order is affirmed, with costs.

Footnotes

Footnote 1: Certain of the single-family lots are also governed by a second, preexisting homeowners' association.

Footnote 2: "Property" is defined as "[a]ll properties as are subject to th[e] [d]eclaration," including "Association [p]roperty," defined as "[a]ll land, improvements and other properties, personal or mixed, now or hereafter owned by [the Association]."

Footnote 3: "The total annual requirements and any supplemental requirements to operate the beach area, harbour, boat docking facilities, tennis courts, and any other facility servicing both the [t]ownhouses and the residential lots shall be allocated among, assessed to and paid by, ALL owners, i.e., [o]wners of [t]ownhouses and [o]wners of any of the [24] residential lots."

Footnote 4: The parties appear to agree that the reference to an annual assessment is regarding the annually-assessed maintenance assessment.

Footnote 5: Other enumerated purposes of assessments include the payment of taxes, commonly metered utilities, insurances and various professional fees that may arise.

Footnote 6: Declaration section 6.01 does go on to provide that "the cost of all maintenance performed by the Association shall be funded from [a]ssessments," assessments again being inclusive of both maintenance and special assessments.