Antara Capital Master Fund LP v Bombardier Inc. (2023 NY Slip Op
50206(U))

BODY {
font-family : "Times New Roman", Times, serif;
font-size : larger;
}

P {
line-height: 150%;
text-indent: 2em
}
.auto-style1 {
text-decoration: underline;
}
.auto-style2 {
font-weight: bold;
text-decoration: underline;
}
.auto-style3 {
font-style: italic;
font-weight: bold;
text-decoration: underline;
}
.auto-style4 {
text-indent: 0em;
}
.auto-style5 {
text-align: center;
}

[*1]

Antara Capital Master Fund LP v Bombardier Inc.

2023 NY Slip Op 50206(U) [78 Misc 3d 1212(A)]

Decided on March 17, 2023

Supreme Court, New York County

Borrok, J.

Published by New York State Law Reporting
Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be
published in the printed Official Reports.



Decided on March 17, 2023
Supreme Court, New York County

Antara Capital
Master Fund LP, CORBIN ERISA OPPORTUNITY FUND LTD, CORBIN
OPPORTUNITY FUND, L.P., Plaintiff,

againstBombardier Inc., JOHN DOE,
Defendant.
Index No. 650477/2022

Plaintiffs by:PALLAS PARTNERS (US) LLP, 75 Rockefeller Plz, New
York, NY 10019Defendants by:CRAVATH, SWAINE &
MOORE LLP, 825 8th Ave, New York, NY 10019


Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion
001) 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, 39, 40,
41, 42, 43, 44, 45, 46, 53, 54, 55, 62, 63, 66, 67, 71, 72 were read on this motion to/for
DISMISSAL.
Upon the foregoing documents and as discussed on the record (3.9.23) and as
otherwise set forth below, the motion to dismiss must be denied solely to the extent of
the claims asserting breach of the Indenture pursuant to which the Plaintiffs' waiver of
(consent to) such breach was required. These claims involve the time honored exception
to requiring compliance with the "no action" clause set forth in the Indenture to establish
standing in connection with a transfer of substantially all of the assets without approval
(Eaton Vance Management v. Wilmington Savings Fund, 171 AD.3d 626 [1st
Dept 2019] citing Cortlandt St.
Recovery Corp. v. Bonderman, 31 NY3d 30, 43, 73 N.Y.S.3d 95, 96 N.E.3d
191 [2018]; Beal Sav. Bank v.
Sommer, 8 NY3d 318, 332, 834 N.Y.S.2d 44, 865 N.E.2d 1210 [2007]; Bezio v General Elec. Co., 66
Misc 3d 261, 267 [Sup Ct, NY County 2019] citing Velez v Feinstein, 87
AD2d 309, 316 [1st Dept 1982]).
As discussed below, the Plaintiffs request for leave to file a second amended
complaint [*2](SAC) is also granted.
The Relevant Facts and CircumstancesThis case involves Bombardier's
unlawful attempt to divest the holders (collectively, the Plaintiffs) of certain
Senior Unsecured 7.45% Notes due 2034 (the Notes) issued in the aggregate
principal amount of $250 million of their bargained for rights under an Indenture (the
Indenture; NYSCEF Doc. No. 19), dated as of April 21, 2004, by and among
Bombardier Inc. (Bombardier) and the Bank of New York Mellon (the
Trustee) as successor trustee to JPMorgan Chase Bank pursuant to which they
could either (x) refuse to waive a breach of Section 9.07 of the Indenture pursuant to
Section 5.14 of the Indenture or (y) exercise their rights pursuant to Section 5.02 of the
Indenture to demand that the Notes be redeemed at the redemption price (which included
the outstanding principal plus the present value of the remaining interest payments which
at the time was approximately $398 million [NYSCEF Doc. No. 7 ¶ 5]).
BackgroundBombardier, a corporation
incorporated under the Canada Business Corporations Act, with its principal place of
business in Montreal, Canada (id., ¶ 23) who issued the Notes and is a party
to the Indenture was a diversified transportation conglomerate that began as a
snowmobile company in the 1930s. By the 1970s, Bombardier had acquired rail
operations which it continued to grow over the next over 30 years. By the 1980s and with
the acquisition of Canadair, Bombardier entered the commercial aerospace sector. By the
1990s, Bombardier acquired Learjet. Throughout the years, Bombardier continued to
grow and develop all of its businesses, including its rail transportation business, its
commercial aircraft business, and its private jet business (id., ¶¶
28-33). In fact, as of 2000, Bombardier had grown into four core businesses: (1) business
aircraft, (2) commercial aircrafts, (3) aerostructures and engineering services and (4)
transportation (id., ¶ 43).
The Initial Breach or Event of DefaultThat
is, until the beginning of 2017, when Bombardier commenced a series of transactions
designed to and with the strategic goal of eliminating any diversity of its business lines
and repositioning itself as a "pure play business jet company" — i.e., going
from a four-business conglomerate to a single business focused company (id.,
¶ 44). More specifically, in 2017, Bombardier sold a majority stake in the
Company's C Series commercial aircraft program. In February 2020, Bombardier
continued its disposition of its remaining minority interest in this program with its sale to
Airbus and the Government of Quebec for approximately $591 million (id.,
¶ 45). In June 2020, Bombardier then sold its CRJ regional jet program to
Mitsubishi Heaving Industries, Ltd for approximately $750 million which completely
divested Bombardier of its commercial aircraft business (id., ¶ 46).
Bombardier then sold its aerostructures and aftermarket services business to Spirit
AeroSystems Holding, Inc. for $1.2 billion (id., ¶ 47). Finally, by January
29, 2021, when Bombardier sold its flagship rail transportation business to Alston
Holdings for approximately $6 billion, Bombardier had disposed of three of its four
business (i.e., its commercial aircraft business, its aerostructures and engineering
services business and its transportation business).
As discussed below, the Plaintiffs allege that these transactions (collectively,
hereinafter, [*3]the Transactions) taken together
which amounted to over 65.5% of Bombardier's EBIT in 2019 (NYSCEF Doc. No. 7
¶ 52), disposed of substantially all of Bombardier's assets in violation of Section
9.07 of the Indenture:
56. Prior to the closing of the Transactions, Bombardier was an enterprise
whose chief virtue was its diversification across a number of business segments, rather
than a company vulnerable to the volatility in business cycles that comes with being
limited to one product line.57. The Company described itself
as a "world-leading manufacturer of innovative transportation solutions, from regional
aircraft and business aircraft to rail transportation equipment." Bombardier 2004 Annual
Information Form at 3. The Company also boasted that for "trains, [it was] number one in
the world" and that for "planes, [it was] a world leader in regional aircraft and business
jets." Bombardier Inc. Annual Report 2003—04. Finally, the Company touted its
Aerostructures and Engineering Services as a "[w]orld leader in the design and
manufacture of complex aircraft structures." Bombardier Website (June 29,
2015).58. As a result of the Transactions, the Company
undertook a "disposal of [its] businesses," including the Commercial Aircraft and
Aerostructures and Engineering businesses, and "discontinued operations" of its
Transportation business. Bombardier Inc. Consolidated Financial Statements (FY2020
and FY2019) at 180. As the Company explained to investors, "[h]aving completed the
sale of its Transportation business to Alstom on January 29, 2021, the [Company] is now
focusing its business aircraft activities under one reportable segment: Aviation." 2020
Bombardier Annual Information Form at 5.59. The
Company's President and Chief Executive Officer, Eric Martel, admitted that the
Company had undergone a fundamental shift as a result of the Transactions. In a
February 2021 earnings call, Mr. Martel acknowledged that "the past year was [] a period
of transformation for Bombardier" and that "[w]ith these transactions behind [it], [the
Company is] now entirely focused on designing, building and servicing the world's best
business jet." Bombardier Earnings Call Transcript (Feb. 11,
2021).60. Financial analysts also took note of Bombardier's
significant transformation. For example, one Goldman Sachs equity research report
advised investors that the BT Transaction "would change the balance sheet profile [of the
Company] considerably" and that "the market could potentially discount lack of
diversification away from the cyclical business jet end-market." Goldman Sachs Equity
Research Report (Feb. 19, 2020) at 1.61. In effect, the
diversified transportation conglomerate the Noteholders looked to for the repayment of
their Notes no longer exists. Instead, the new Bombardier is narrowly focused on its only
remaining business: the niche, cyclical Business Aircraft segment. As reported in the
press, it is clear that "Bombardier bet[] [it] all on private
jets."(citing Jason Kirby, Bombardier Bets All on
Private Jets, Financial Times, (Mar. 17, 2020), 
https://ww
w.ft.com/content/77412380-66c4-11ea-a3c9-1fe6fedcca75).62. The complete divestment of three of its four business segments was not in the
regular course of Bombardier's business.63. For decades, the
Company was engaged in the business of developing "products and services [that]
provide world-class transportation experiences that set new standards in passenger
comfort, energy efficiency, reliability and safety." Bombardier, Inc., About Us, [*4]https://www.bombardier.com/en/about-us.html. In sum,
Bombardier's focus was always on its "core businesses—plans and trains."
Bombardier 2005 Annual Report at 5.64. The disposal of
assets via the Transactions was a stark departure from Bombardier's regular operations.
Bombardier was never merely a holding company or a company otherwise in the business
of routinely selling off its assets. Indeed, the uncharacteristic BT Transaction alone was
the largest divestiture in the Company's history.G. The
Transactions Gave Rise to Material Breaches of the
Indenture(citing Frédéric Tomesco, Bombardier
Transportation as Alstom buys train-making business, Montreal Gazette (Feb. 18, 2020) 
https://montrealgazette.com/busines
s/local-business/aerospace/end-of-
line-draws-near-for-bombardier-trains-as-alstom-confirms-
talksNo.:~:text=Story%20continues%20below
,Article%20content,sales%20of%20US%2420.1%20billion).65. Section 9.07 of the Indenture prohibits the Company from disposing of "the
whole or substantially the whole of [its] undertaking or assets." Ex. A, Indenture at
55.66. In addition, Section 7.01 provides that the Company
shall not "transfer its properties and assets substantially as an entirety" unless the
corporation to which the assets are transferred expressly assumes the Company's
obligations under the Indenture. Id. at 48.67. The Company
has long acknowledged that its debt covenants could "restrict" its "ability to . . . sell all or
substantially all of its assets." 2005 Bombardier Management's Discussion and Analysis
("2005 Bombardier MD & A") at 56. Since at least 2005, the Company has
consistently identified these provisions as "risks and uncertainties" in its disclosures to
investors. Id. at 53, 56. See also 2020 Bombardier Management's Discussion and
Analysis ("2020 Bombardier MD & A") at 84, 85 (disclosing as a "[f]inancing risk,"
the Company's "[r]estrictive and financial debt covenants," which "may materially
adversely affect [the Company's] financial flexibility" by "restrict[ing]" the Company and
its subsidiaries' "ability to . . . dispose of assets . . . sell assets . . . [or] change the business
conducted by" the Company). The Company also advised its investors that any "breach
of any of these agreements . . . could also result in a default under its bank lines, which
would permit the [Company's] lenders to declare amounts owed to them immediately
payable." 2005 Bombardier MD & A at 56; see also 2020 Bombardier MD &
A at 85 ("A breach of any of these agreements or our inability to comply with these
covenants could result in a default under these facilities, which would permit . . . our
bond holders and other lenders to declare amounts owed to them to be immediately
payable.").68. The Company nevertheless proceeded to
breach these covenants when it (1) disposed of assets that were economically significant
to the Company, and (2) engaged in the Transactions, which fundamentally changed the
nature of the Company's business and were not part of its regular
operations.69. As a result, the Company's Transactions
resulted in a material breach and default of the Indenture. Those Transactions have all
closed, the defaults are not reasonably subject to cure and were not waived, and
accordingly the Noteholders are entitled to specific performance of the Company's
redemption of the Notes prior to their maturity and payment of the Make Whole as set
forth more fully below.(id., ¶¶ 56-69)
[*5]The
IndenturePursuant to Section 9.07, Bombardier agreed that it would
not sell substantially all of its assets:
Section 9.07 Disposition as a WholeExcept as
provided in Article Seven, the Corporation and its Subsidiaries, taken as
a whole, will not (whether by a single transaction or a number of related
or unrelated transactions and whether at the same time or over a period of
time) sell, transfer, lease out, lend or otherwise dispose of the
whole or substantially the whole of their undertaking or
assets(NYSCEF Doc. No. 8 § 9.07 [emphasis
added]).As discussed above, by conducting these sales and disposing of these assets,
the Plaintiff holders of the Notes allege that Bombardier violated Section 9.07 of the
Indenture.
Pursuant to Section 7.01, Bombardier agreed that it would not merge or consolidate
with any other corporation or transfer its properties or assets to any person unless such
other corporation assumed the obligations under the Indenture and executed
supplemental documents in form and substance satisfactory to the Trustee:
Section 7.01 Consolidation, Merger. Amalgamation or Succession to
BusinessThe Corporation shall not consolidate with,
amalgamate with or merge into any other corporation or convey or transfer its properties
and assets substantially as an entirety to any Person,
unless:(a) the corporation formed by such consolidation or
amalgamation or into which the Corporation is merged or the Person which acquires by
operation of law or by conveyance or transfer the properties and assets of the
Corporation substantially as an entirety shall be a corporation and shall (except in any
case where such assumption is deemed to have occurred by the sole operation of law or
except where the Corporation is the surviving legal entity), expressly assume, by an
indenture supplemental hereto, executed and delivered to the Trustee, in form
satisfactory to the Trustee, the due and punctual payment of the principal of and interest
on all the Securities and the performance of every covenant of this Indenture on the part
of the Corporation to be performed or observed, provided however that if such
corporation or Person is not a corporation organized or existing under the laws of Canada
or any province or territory thereof or of the United States, any state therefor the District
of Columbia and if, solely as a result of any such consolidation, amalgamation or merger
or conveyance or transfer, any taxes, duties, assessments or other governmental charges
of whatever nature are imposed or levied on or are withheld or deducted from the
payments of principal or interest on the Securities by or on behalf of any government,
such corporation or Person shall undertake in favor of the Trustee for the benefit of the
Holders of Securities to pay such additional amounts as may be necessary in order that
the net amount received by the Holders of Securities after any such imposition, levy,
withholding or deduction shall equal the respective amounts of principal and interest
which would have been receivable in respect of the Securities had such consolidation,
amalgamation, merger, conveyance or transfer not occurred;(id.,
§ 7.01)Pursuant to Section 5.02 of the Indenture, the parties agreed that the
Trustee could at the [*6]time of any Event of Default may
in its discretion, and if so requested by the holders of not less than a majority in the
aggregate principal amount of the Securities Outstanding, declare the Notes to be due
and payable:
Section 5.02 Acceleration of MaturityIf an
Event of Default with respect to Securities at the time Outstanding occurs and is
continuing, then and in every such case the Trustee may, in its discretion
and shall, if so requested by the Holders of not less than a majority in aggregate principal
amount of the Securities Outstanding, declare the principal of,
and premium, if any, on all the Securities to be due and payable immediately, by
a notice in writing to the Corporation, and upon any such declaration such principal, and
premium, if any, shall become immediately due and
payable.The Corporation covenants that
if:(1) default is made in the payment of any installment of
interest on any Security when such interest becomes due and payable and such default
continues for a period of30 days, or(2) default is made in the
payment of the principal of (or premium, if any, on) any Security at the Maturity
thereof,the Corporation shall, upon demand of the Trustee,
forthwith pay to the Trustee, for the benefit of the Holders of the Securities, the whole
amount then due and payable on such Securities, for the principal of (and premium, if
any) and interest accrued to the date of such payment on all such Securities and all other
money owing under the provisions of the Indenture in respect of such Securities, together
with interest from the date of such demand to the date of such payment upon overdue
principal and premium and, to the extent that payment of such interest shall be
enforceable under applicable law, on overdue installments of interest and on such other
money at the same rate as the rate of interest specified in the Securities; and, in addition
thereto, such further amount as shall be sufficient to cover the costs and expenses of
collection, including the reasonable compensation, expenses, disbursements and
advances of the Trustee, its agents and Counsel, except as a result of negligence or bad
faith.Until such demand shall be made by the Trustee, the
Corporation shall pay the principal of (and premium, if any) and interest on the Securities
to the Holders in accordance with the terms hereof and thereof, whether or not payment
of any amount in respect of such Securities shall be
overdue.If the Corporation fails to pay such amounts
forthwith upon such demand, the Trustee, in its own name and as trustee of an express
trust, may institute a judicial proceeding for the collection of the sums so due and unpaid,
and may prosecute such proceeding to judgment or final decree, and may enforce the
same against the Corporation and collect the money adjudged or decreed to be payable in
the manner provided by law out of the property of the Corporation, wherever
situated.If an Event of Default with respect to the Securities
occurs and is continuing, the Trustee may proceed to protect and enforce its rights and
the rights of the Holders of Securities by such appropriate judicial proceedings as the
Trustee shall deem most effectual to protect and enforce any such rights, whether for the
specific enforcement of any covenant or agreement in this Indenture or in aid of the
exercise of any power granted herein, or to enforce any other proper
remedy.If an Event of Default shall have occurred and be
continuing the Trustee shall, within 30 days after a Responsible Officer becomes aware
of the occurrence of such Event of Default, give notice of such Event of Default to the
Holders of the Securities then Outstanding affected thereby in the manner provided in
Section 1.07, provided that, notwithstanding the foregoing, except in the case of Events
of Default described in clauses (a) and (b) of Section 5.01, the Trustee shall not be
required to give such notice if the Trustee in good faith shall have decided that the
withholding of such notice is in the best interests of the Holders of the Securities then
Outstanding affected thereby and shall have so advised the Corporation in writing.
Where a notice of the occurrence of an Event of Default has been given to the Holders of
such Securities pursuant to the preceding sentence and the Event of Default is thereafter
cured, the Trustee shall give notice that the Event of Default is no longer continuing to
the Holders of such Securities within 30 days after a Responsible Officer becomes aware
that the Event of Default has been cured
(id., § 5.02). Thus, as discussed above, the Plaintiffs
allege that the disposition Transactions described above triggered their right to claim the
Notes immediately due and payable and as discussed below, they made such demand.
Significantly, however, the Plaintiffs do not adequately allege or sue the Trustee for
breaching its obligation in not bringing suit.
Although pursuant to Section 3.01 of the Indenture, Bombardier reserved the right
"without notice or consent of the Holders, [to] 'reopen' the series of Securities by
increasing the aggregate principal amount of the series and issue Additional Securities in
the future ", significantly as it relates to this case, Bombardier agreed that only a majority
in interest in the aggregate principal amount of the Securities at the time of an event
of default or breach could waive any past default or breach:
Section 5.14 Waiver of Past DefaultsPrior to
the declaration of acceleration of the Maturity of the Securities as provided by Section
5.02, the Holders of a majority in aggregate principal amount of the Securities at
the time Outstanding with respect to which a default or breach or an Event of Default
shall have occurred and be continuingshall have the right exercisable by Act of
such Holders to waive any past default or breach or Event of Default and its
consequences, except a default not theretofore cured:1. (a) 
in the payment of the principal of or any premium or interest on any Security,
or2. (b) in respect of a covenant or provision hereof which
under Article Eight cannot bemodified or amended without
the consent of all Holders of all Outstanding Securities affected
thereby.Upon any such waiver, such default or breach shall
cease to exist, and any Event of Default arising therefrom shall be deemed to have been
cured, for every purpose of this Indenture, but no such waiver shall extend to any
subsequent or other default or breach or Event of Default or impair any right consequent
thereon.
(id., §5.14 [emphasis added]). In other words,
Bombardier could not issue new securities to a friendly investor for the purpose of
frustrating the existing Note holders' rights. As discussed below, this is the very wrong
alleged in the AC.
Equally significant, the parties agreed that the holders of a majority in the aggregate
principal amount of the Notes could waive non-compliance if such waiver was obtained
prior to the time of such non-compliance:
Section 9.10 Waiver of Certain CovenantsThe
Corporation may omit in any particular instance to comply with any term, provision or
condition set forth in Sections 9.05 and 9.07 through 9.08, inclusive, with respect to the
Securities if before the time for such compliance the Holders of at least a majority in
aggregate principal amount of the Outstanding Securities, by Act of such Holders, either
shall waive such compliance in such instance or generally shall have waived compliance
with such term, provision or condition, but no such waiver shall extend to or affect such
term, provision or condition except to the extent so expressly waived, and, until such
waiver shall become effective, the obligations of the Corporation and the duties of the
Trustee in respect of any such term, provision or condition shall remain in full force and
effect(id., § 9.10). 
To be clear, the Plaintiffs allege that the provisions, taken as a whole, were designed
to strike the necessary balance between recognizing that as an operating business,
Bombardier would need to issue additional debt from time to time and therefore could
reopen the issuance of the Notes for any reason and could increase its size, but provided
for the protection of the rights of the Note holders who would be affected by any
Bombardier breach of the Indenture. Thus, to the extent that an event of default or breach
would occur by virtue of Bombardier's conduct, Section 9.10 provided for the
prospective waiver of compliance with the Indenture and Section 5.14 provided for
retroactive waiver of compliance with the Indenture only by holders of the Notes at
the time of the event of default or breach of the Indenture. And, once an event of
default or breach occurred, the Plaintiffs allege that Bombardier no longer could avail
itself of its rights in Section 3.01 to increase the size of the Notes offering at the expense
of the Plaintiffs — the aggrieved party.
Significantly as it relates to the instant motion, the Indenture also contained a
"no-action" provision that, among other things, required a majority of Note holders to
make a demand on the Trustee to institute any proceeding in its own name:
Section 5.08 Limitation on SuitsNo Holder of
any Security shall have any right to institute any action, suit or proceeding, judicial or
otherwise, with respect to this Indenture, for payment of any principal, premium, if any,
or interest owing on any Security, or for the execution of any trust or power hereunder or
for the appointment of a custodian, receiver, liquidator, assignee, trustee, sequestrator or
other similar official, or to have the Corporation wound up, or for any other remedy
hereunder, unless:(a) such Holder shall have previously
given written notice to the Trustee of the occurrence of a continuing Event of Default
hereunder with respect to the Securities;(b) the Holders of
not less than a majority in aggregate principal amount of the Securities then Outstanding
shall have made written request to the Trustee to institute such proceeding in its own
name as Trustee hereunder;(c) such Holder or Holders shall
have offered to the Trustee, when so requested by the Trustee, reasonable indemnity
satisfactory to it against the costs, expenses and liabilities to be incurred therein or
thereby in compliance with such request;(d) the Trustee for
60 days after its receipt of such notice, request and offer of indemnity shall have failed to
institute such action, suit or proceeding; and(e) no direction
inconsistent with such written request shall have been given to the [*7]Trustee during such 60 day period by the Holders of not
less than a majority in aggregate principal amount of the Securities then Outstanding
(voting as one class);it being understood and intended that
no one or more Holders of Securities shall have any right in any manner whatsoever by
virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice
the rights of any other Holder of the Securities, or to obtain or to seek to obtain
preference or priority over any other such Holder or to enforce any right under this
Indenture, except in the manner herein provided and for the equal and ratable benefit of
all Holders of Securities(id., § 5.08).
The Subsequent BreachOn April 22, 2021, the
Plaintiffs sent a letter to Bombardier to provide a formal notice of default and material
breach of Section 9.07 and 7.01 of the Indenture and indicated that because the
Transaction deals had closed the breaches were not curable (NYSCEF Doc. No. 7,
¶ 73). In response, on May 3, 2021, Bombardier responded that it was in
compliance with its obligations under the Indenture but separately launched a series of
consent solicitations for its then outstanding senior note holders including as to the Notes
which consent as to the Notes Bombardier failed to obtain:
74. On May 3, 2021, the Company's counsel responded to the letter simply
to assert, based on its own conclusory assertions about the Company's financial
projections, that the Company was in compliance with its obligations under the
Indenture.75. But the Company's actions spoke louder than
its words. On the same day, the Company launched a series of consent solicitations for
the 2034 Notes as well as the Company's 5.75% Senior Notes due 2022, 6.00% Senior
Notes due 2022, 6.125% Senior Notes due 2023, 7.5% Senior Notes due 2024, 7.5%
Senior Notes due 2025, 7.35% Debentures due 2026, and 7.875% Senior Notes due
2027.76. The Consent Solicitations, which are a tacit
concession as to the legitimacy of Plaintiffs' core claim, sought the noteholders' consent
to waive any "Defaults or Events of Default" arising in connection with the Transactions.
As they acknowledged, "[e]ach Consent Solicitation require[d] consent from holders
representing the requisite majority of the outstanding aggregate principal amount of such
series of notes." Upon obtaining the requisite consent, the Company would execute a
supplemental indenture reflecting the proposed amendments (the "Supplemental
Indenture"). In exchange for the noteholders' consent, the Company would pay each
consenting holder $1.25 per $1,000 principal amount of the applicable series of notes.
The deadline to consent was set for May 11, 2021.77. On
May 12, 2021, the Company announced that it had obtained the requisite consent from
the holders of the 6.00% Senior Notes due 2022, 6.125% Senior Notes due 2023, 7.5%
Senior Notes due 2024, and 7.5% Senior Notes due 2025. However, the Company failed
to secure consent from the holders of the other series of notes, including the 2034 Notes.
The Company then extended the consent deadline until May 13, 2021. By May 14, 2021,
the Company had once again failed to obtain consent from the 2034 Notes but yet again
extended the Consent Solicitation deadline, this time until May 18,
2021(NYSCEF Doc. No. 7, ¶¶ 74-77).This extension the
Plaintiffs allege was an improper stall tactic because no rational holder of the Notes
would accept $1.25 per $1,000 principal when, pursuant to the terms of the Indenture,
the holders of the Notes were entitled to 159% of the face value (not the 12.5 basis points
offered).
Then, on May 18, 2021, Bombardier issued an additional $260 million of the Notes
(the New Notes,i.e., purporting to expand the offering pursuant to
Section 3.01 of the Indenture) to an unnamed Institutional Investor for the purpose of
trying to divest the Plaintiffs of their ability to cause the Trustee to bring suit under
Section 5.08 of the Indenture and to divest them of their rights to waive or refuse to
waive the default under Section 5.14 of the Indenture and to otherwise prevent them
from being able to demand redemption and payment of the make whole premium under
the Indenture:
79. With judgment day approaching, the Company finally pivoted to what
it likely had been planning all along. On May 18, 2021, the Company announced that it
had issued $260,000,000 in principal aggregate amount of additional 7.45% Senior
Notes due 2034 to the unnamed Institutional Investor. The New Notes were issued at par,
notwithstanding that the Company's existing 7.45% Notes due 2034 were trading
materially higher (approximately 105% of par), with a substantially lower yield
(approximately 6.85%). This issuance substantially increased the aggregate principal
amount outstanding under the 2034 Notes by 104% (from $250,000,000 to
$510,000,000).80. The Company's announcement made
clear that it had orchestrated this scheme in concert with the Institutional Investor. On
information and belief, the Company informed the Institutional Investor about the
Indenture and the Company's ongoing breach and default of Section 9.07 of the
Indenture. The Institutional Investor offered to purchase the New Notes at a
below-market discount in return for providing the putative consent to waive the
Company's prior defaults under the Indenture. According to a revised Consent
Solicitation Statement, "The Company has obtained the Investor's consent in respect of
the Proposed Amendments to the 2034 Indenture described in the Consent Solicitation
Statement" and "The Investor has further agreed to give its affirmative consent in the
Consent Solicitation with respect to the 2034 Notes that it beneficially
owns."81. The obvious purpose of this maneuver was to vest
this Institutional Investor with a majority of the 2034 Notes and entirely disenfranchise
all other Noteholders, which otherwise would be entitled to specific performance of the
Company's redemption and payment of the Make Whole as a result of the Company's
breach of covenant. The issuance of the New Notes by the Company and their purchase
by the Institutional Investor had no legitimate business purpose. Contrary to the
Company's recent "commitment of deleveraging" its balance sheet, the Company
incurred $260 million of new debt in issuing the New Notes. The New Notes also were
issued at a yield far higher than the Company's existing bonds with identical terms,
evidencing that the Company was forced to offer a substantial premium to the
Institutional Investor to secure its consent. Moreover, the Consent Solicitation did not
extend the maturity on the 2034 Notes, thereby needlessly increasing, by more than 100
percent, the debt that the Company will have to repay by 2034. Instead, the Company's
and the Institutional Investor's sole purpose was to disenfranchise existing note holders,
prevent their exercise of remedies, and improperly attempt to extinguish the Company's
liability for its covenant breaches.(Citing Press
Release, Bombardier, Bombardier Announces Further Deleveraging Actions with Full
Repayment of its 61 8% Senior Notes Due 2021 (May 17, 2021), 
https://www.globenewswire.com/news-release/2021/05/17/2230733/
0/en/Bombardier-Announces-Further-Deleveraging-Actions-with-Full-Repayment-of-its-
6-Senior-Notes-Due- 2021.html. Indeed, at the time the New Notes were issued, the
existing 2034 Notes — with an identical coupon and term — were trading
at approximately 105% of par, implying a yield of approximately 6.85%. By contrast, the
Company issued the New Notes to the anonymous Institutional Investor at 100% of par
offering price and 7.45% yield.)82. The Company has only
continued to reaffirm the lack of any legitimate business purpose for the issuance of the
New Notes. For example, on February 15, 2022, the Company announced a partial
redemption of other unsecured notes by paying approximately $10 million in
make-whole premiums to pay off debt with effectively the same coupon as the 2034
Notes at issue. Yet, in purporting to issue the New Notes here, the Company willingly
incurred $260 million of new debt and paid a premium to do so. Not only was this
lacking in any legitimate business purpose, but, as demonstrated by the Company's
subsequent liability management, it was contrary to the Company's stated business goals
of deleveraging the Company's balance sheet(id.,
¶¶ 79-82).To be clear, the Plaintiffs do not allege that Bombardier
could not issue new debt that would constitute Additional Securities if Bombardier
had issued the $260 million of new Notes to expand the 2034 offering and also
issued sufficient debt to redeem the existing holders of the Notes — i.e., the
Plaintiffs — at par with payment of the make-whole premium as they were entitled
to under the Indenture. Rather, what the Plaintiffs allege that Bombardier could not
however do was to issue new debt for no corporate purpose whatsoever other than to
block the Plaintiffs from having the requisite majority in interest to compel the Trustee to
bring suit to protect their rights.
The TrusteeSignificantly, the Plaintiffs
allege that the Trustee was complicit in this scheme but do not allege that the Trustee was
in breach of the Indenture for failing to properly exercise its rights pursuant to Section
5.04 of the Indenture to demand redemption and repayment on behalf of the
Plaintiffs:
83. The Indenture Trustee was complicit in this scheme. In coordination
with the Company and the Institutional Investor, the Indenture Trustee authenticated and
delivered the New Notes to the Individual Investor. The Company's Consent Solicitation
Statement made clear that the impetus for the Consent Solicitation was Plaintiffs'
counsel's April 22 Letter. For example, in the "Certain Significant Considerations"
section: "One of the Company's bondholders has claimed that the Transactions resulted
in one or more defaults of certain covenants under the Indentures. On April 22, 2021, we
received a purported notice of default under the 2034 Indenture which alleged that we
had breached certain covenants under the 2034 Indenture." Ex. B, Consent Solicitation
Statement at 13; see also id. At 8 (emphasis in original). Under Section 3.02 of the
Indenture, the Indenture Trustee had the "right to decline to authenticate and deliver" the
[*8]New Notes. Instead, in service of the scheme to
silence the existing majority, the Indenture Trustee authenticated and delivered the New
Notes to the Institutional Investor and then executed the Supplemental Indenture, the
purpose of which was "to waive any Default or Event of Default that is alleged to have,
has or may arise under the Indenture in connection with the Transactions." Ex. B,
Consent Solicitation Statement Annex A, Supplemental Indenture at
2.84. On January 31, 2022, counsel for Plaintiffs sent a
formal Notice of Default to the Company and Indenture Trustee pursuant to Section
5.01I of the Indenture, specifically identifying the defaults in the performance, and
breaches, of the Indenture as described herein, and requesting that the Indenture Trustee
"institute a proceeding in its own name to address the
breaches."85. On February 17, 2022, Plaintiffs and the
Indenture Trustee filed a joint stipulation of dismissal (the "Stipulation"). See NYSECF
Doc. No. 5. The Stipulation confirms, among other things, that the Indenture Trustee
received Plaintiffs' Notice of Default on January 31, 2022, but that the Indenture Trustee
"cannot, and therefore will not institute [the present action] in its own name, or otherwise
act at the direction of Plaintiffs, within 60 days of the alleged Notice of Default." Id. At
4. Having authenticated and delivered the purported New Notes at the crux of the
dispute, the Indenture Trustee cannot reasonably be expected to pursue claims that the
New Notes are invalid. The Stipulation confirms that reality and demonstrates that
Plaintiffs have standing to pursue these claims themselves.
(NYSCEF Doc. No. 7, ¶¶ 83-85). In addition, the Plaintiffs allege
(i) that the New Notes do not qualify as Additional Securities under the Indenture
because Bombardier could not issue these New Notes while they were in material breach
of its own obligations (id., ¶¶ 86-89), (ii) the holders of the New
Notes (i.e., the Institutional Investor) could not waive the past due defaults
pursuant to Section 5.14 and (iii) the Trustee had a conflict of interest in that by
authenticating the New Notes, the Trustee could not bring this lawsuit as it would pit one
set of holders of the 2034 Notes against another set of holders of the 2034 Notes. 

In May 2021, after Bombardier issued the New Notes to the Institutional Investor,
the Institutional Investor agreed to waive any alleged default set forth in Antara's April
22, 2021 letter (NYSCEF Doc. No. 31, at 2). In response, the Plaintiffs sent a notice of
default to Bombardier and to the Trustee on January 31, 2022 and sued both Bombardier
and the Trustee (NYSCEF Doc. No. 2), asserting (i) breach of contract and Action for
Specific Performance — Breach of Indenture Section 9.07 (against Bombardier
Inc.), (ii) Breach of Contract Section 5.14 and 9.10 against Bombardier and BNY
Mellon, (iii) Breach of Contract —Covenant of Good Faith and Fair Dealing
(against Bombardier), (iv) Declaratory Judgment — Invalid Issuance of Additional
Securities against Bombardier and BNY Mellon, (v) Declaratory Judgment —
Invalidity of Supplemental Indenture against BNY Mellon), and (iv) Tortious
Interference with Contract against the Institutional Investor.
The Plaintiffs subsequently entered into a stipulation with the Trustee dated February
17, 2022 whereby, among other things, the Plaintiffs discontinued their claims against
the Trustee without prejudice (NYSCEF Doc. No. 5). In the Stipulation, the Trustee
indicated "that it asserts it cannot, and therefore will not, institute the Requested Proceeds
in its own name, or otherwise act at the direction of Plaintiffs, within 60 days of the
alleged Notice of Default, regardless of [*9]whether
Plaintiffs provide a satisfactory indemnity, unless and until the Court were to award
certain of the relief requested by Plaintiffs" in this action (id., at 4).
The Plaintiffs then filed the AC dated March 28, 2022, asserting causes of action
against Bombardier for (i) breach of contract for breach of Section 9.07 of the Indenture
and for specific performance (first cause of action), (ii) breach of contract for breach of
Sections 5.14 and 9.10 of the Indenture (second cause of action), (iii) breach of the
implied covenant of good faith and fair dealing (third cause of action), (iv) a declaratory
judgment that the New Notes issued to the Institutional Investor were invalid (fourth
cause of action), and (v) a declaratory judgment that the supplemental indenture issued
by Bombardier providing that any default caused by the Transactions was waived is
invalid (fifth cause of action). They also asserted a cause of action against John Doe,
i.e., the Institutional Investor, for tortious interference with contract. They do not
adequately allege demand futility in the AC.
Specifically, and for clarity, the AC does not adequately allege that (i) holders of the
New Notes should be disregarded for Section 5.08 purposes because it otherwise renders
their post Transaction waiver rights set forth in Section 5.14 meaningless, (ii) demand is
futile because no rational holder could be expected to accept a facially inferior offer and
the Trustee should have known this and failed to act accordingly in breach of its good
faith obligations under the Indenture to bring suit and the Trustee's failure to recognize
this is further evidence of demand futility, (iii) demand futility is established by the failed
consent solicitation which again should have activated the Trustee to bring suit at that
time to cause the redemption of the Notes and finally, (iv) the indemnification
requirement does not apply because there is no obligation to indemnify the Trustee for
the Trustee's own breach. Upon proper amendment of the AC reflecting the foregoing,
however, the claims could likely proceed.

Discussion
On a motion to dismiss, the court must afford the pleading a liberal construction and
accept the facts as alleged as true, according the plaintiff the benefit of every possible
favorable inference, and determine only whether the facts as alleged fit any cognizable
legal theory (Leon v Martinez, 84 NY2d 83, 87-88 [1994]).
Any default or Event of Default arising from the
Transactions was not properly waived by the Institutional Investor pursuant to Section
5.14 of the IndentureInitially, the Court notes that Bombardier's argument
that any default or Event of Default arising from the Transactions was waived by the
Institutional Investor fails. Pursuant to Section 5.14 of the Indenture, waiver of a default
or Event of Default could only be made by "the Holders of a majority in aggregate
principal amount of the Securities at the time Outstanding with respect to which a
default or breach or Event of Default shall have occurred and be continuing "
(NYSCEF Doc. No. 19, § 5.14 [emphasis added]). The Institutional Investor was
not a holder of the New Notes at the time of the Transactions and Bombardier did not
obtain waiver from the majority of holders of the Notes that were outstanding at the time
of the alleged default, thus, the post-transaction waiver was ineffective.
In the AC, the Plaintiffs have not pled (i) allegations against
the Trustee sufficient to demonstrate that Section 5.08 does not apply to certain of the
claims, or (ii) demand futilityIt is undisputed that the Plaintiffs did not
comply with the "no-action" clause of the [*10]Indenture
because it failed to offer the Trustee the requisite indemnification or wait the required 60
days before initiating this lawsuit. Thus, without pleading particularized facts
demonstrating demand futility (which Plaintiffs will be given an opportunity to do), the
Plaintiffs simply lacks standing to bring claims other than claims sounding in breach of
the Indenture as discussed below.
Where a trustee is given the power to bring suit on behalf of the trust, a beneficiary
of the trust may only bring an action if it makes a showing (i) of a demand on the trustee
to bring suit and a refusal by the trustee that is so unjustifiable as to constitute an abuse
of the trustee's discretion, or (ii) that it is futile to make such a demand on the trustee
because of the trustee's conflict of interest (Bezio v General Elec. Co., 66 Misc 3d 261, 267 [Sup Ct,
NY County 2019], citing Velez v Feinstein, 87 AD2d 309, 316 [1st Dept 1982]).
To show demand futility, the complaint must set forth with particularity the efforts to
secure the initiation of the action by the trustee or the reasons for not making such effort
(Velez, 87 AD2d at 316). Thus, pursuant to the "no-action" clause described
above, the Plaintiff was required to make a demand on the Trustee, offer proper
indemnification and wait the proper time period for the Trustee to sue, to sue to compel
the Trustee to bring suit against Bombardier, or if appropriate to allege demand futility
because of the Trustee's breach such that making a demand on the
Trustee would amount to demanding that the Trustee sue itself as to the claims not
sounding in breach of the Indenture requiring their waiver of / consent to such breach.
Inasmuch as the Plaintiff has not adequately done this in the AC, the AC must be
dismissed without prejudice as to the Plaintiffs claims not sounding in breach of the
Indenture requiring their consent to / waiver of such breach.
For completeness, the Plaintiff's reliance on Eaton Vance Management v
Wilmington Sav. Fund Soc., FSB, 2018 WL 1947405 (Sup Ct, NY County 2018) for
their argument that non-breach of Indenture causes of action (i.e., their
declaratory judgment causes of action) do not require either (x) compliance with the
"no-action" provision of the Indenture or otherwise (y) do not require the Plaintiffs to
plead demand futility fails.
In Eaton Vance, the plaintiffs who were senior creditors of J. Crew Group
owned approximately 10% of the Company's term loan were at odds with the holders of
the majority of the term loan. Many of those other creditors also owned Senior PIK
Toggle Notes that were issued by the parent and controlling shareholder of the parent of
J. Crew.
Following the issuance of the PIK Notes, the parties restructured the debt pursuant to
an Amended Restate Credit Agreement which prohibited the transfer of any of the
collateral to an entity that was not a Restricted Subsidiary. Significantly, Article IX of the
Amended Credit Agreement contained an exculpation clause for the Administrative
Agreement for any action taken (i) with the consent of the Required Lenders or (ii) in the
absence of its own gross negligence or willful misconduct. Article X defined Required
lenders as having more than 50% of the sum of the (a) outstanding Loans and the (b) the
aggregate unused commitment. Notwithstanding the foregoing, Section 10.01(e) and (f)
required written consent of each Lender to a transaction or series of transactions that
involved a transfer of substantially all of the collateral or the guaranty. Section 10.19
contained a "no-action" provision pursuant to which the lenders agreed that they would
not sue without the prior written consent of the Administrative Agent.
Subsequently, J. Crew and certain subsidiaries restructured their debt pursuant to
which the collateral was transferred to Unrestricted Subsidiaries. There were a number of
objections from term lenders and then J. Crew filed an action (i.e., not the
Eaton Vance case) seeking a [*11]declaration that
the transactions did not violate the agreement. The lenders filed an answer and asserted
counterclaims challenging the legitimacy of the disputed transactions. Subsequently, J.
Crew executed a private exchange offer in which the PIK Notes would be swapped for
new senior secured notes and preferred stock and J. Crew simultaneously solicited
consent from its lenders to ratify the disputed transactions. Ultimately, 85% of the term
lenders consented. 12% refused to consent and filed the Eaton Vance lawsuit.

Initially they sought a TRO and preliminary injunction. The court denied the TRO.
The transaction closed and the parties discontinued the other action. In the Eaton
Vance lawsuit, the plaintiffs alleged that the disputed transactions constituted a
transfer of all or substantially all of the collateral requiring their consent. The defendants
moved to dismiss alleging lack of standing. The motion was withdrawn and the plaintiff
filed an amended complaint where among other things it brought a cause of action
sounding in intentional fraudulent conveyance under section 276 and 278 of the New
York Debtor and Creditor Law and a fraud claim that the plaintiff argued did not require
application of the "no action" clause because making a demand on the Administrative
Agent would have been futile.
The court (Kornreich, J.) held that the plaintiffs fail to allege any bad faith, gross
negligence or willful misconduct on behalf of the Administrative Agent such that the
exculpation provision described above would not apply because as a neutral agent its
duties were ministerial to carry out its specified obligations and the plaintiffs argument
that the Administrative Agent was just wrong to accept J. Crew's position that majority
and not unanimous consent was necessary to ratify the transfers also did not form a basis
to hold the Administrative Agent liable because at most this constituted ordinary
negligence (and this conduct was covered by the exculpation clause).
As to the J Crew defendants, the Court indicated that "no-action" clauses are strictly
enforced citing Quadrant
Structured Prods. Co. v Vertin, 23 NY3d 549, 560 (2014), among others. Thus,
the Court held that inasmuch as the fraudulent conveyance and fraud claims concern the
collateral, Section 10.19 — the "no action" clause — would bar the
plaintiffs from maintaining the claims. Relying on Cypress Assocs., LLC v Sunnyside
Cogeneration Assocs. Project, 2006 WL 668441 (Del Ch 2006) (Strine, V.C.) where
the court held that a finding of demand futility would allow a bondholder subject to an
indenture's "no-action" clause to proceed with its ability to enforce its consent rights, the
plaintiffs argued that demand would be futile to seek permission from the Administrative
Agent and they should nonetheless be entitled to proceed on their claims. The court
disagreed however and held that neither Cyprus nor any other authority cited by
the plaintiffs permitted the plaintiff to proceed on its fraud claims against J. Crew. In
addition, the Court noted that even if the Administrative Agent's status as a conflicted
decisionmaker could justify a finding of demand futility, the plaintiffs had failed to
demonstrate that the Administrative Agent was conflicted and given the broad
exculpation clause, it was hard to see how they could be conflicted. Thus, because the
plaintiffs had not alleged the Administrative Agent faced a credible threat of a
non-exculpated act, the plaintiffs had no basis to contend that the Administrative Agent
could not have impartially considered a demand for permission to sue. Accordingly, the
court held that plaintiffs lacked standing and dismissal was required.
Upon appeal, the Appellate Division held that
The motion court correctly found that the no-action clause in the
amendment to the Term Loan Agreement (TLA) barred all but the breach of contract
claims, which allege that all [*12]or substantially all of
the TLA collateral was transferred without unanimous approval; claims alleging the
transfer of substantially all of the collateral without unanimous approval are a
specifically delineated exception to the no-action clause (see Cortlandt St. Recovery Corp. v.
Bonderman, 31 NY3d 30, 43, 73 N.Y.S.3d 95, 96 N.E.3d 191 [2018]; Beal Sav. Bank v. Sommer, 8
NY3d 318, 332, 834 N.Y.S.2d 44, 865N.E.2d1210[2007]). That the underlying
factual basis for the fraud claims is the same disputed transaction underlying the contract
claims does not bring the fraud claims within that narrow exception.
Eaton Vance, 171 AD.3d 626 (2019).In other words, Eaton Vance
does not stand for the general proposition that the "no-action" clause does not apply
to certain of the causes of action asserted in this case. Indeed, the case indicates that
"no-action" clause apply to all of the causes of action other than the claims sounding in
breach of the Indenture requiring the Plaintiffs' waiver of (consent to) such breach and
that compliance with the "no action" clause is otherwise excused only where demand
futility can be properly alleged. The Court notes that, significantly in that case, the
plaintiffs did allege demand futility and didsue the
Administrative Agent but nonetheless lacked standing based on the broad exculpation
clause which only permitted suit against the Administrative Agent based on gross
negligence and willful misconduct. In this case, (i) the Plaintiffs have not complied with
the "no-action" clause, (ii) have failed to allege particularized facts to suggest demand
futility, including that the Trustee could face exposure for its own breach, and (iii) have
otherwise pursuant to the AC not sued the Trustee to compel the Trustee to sue
Bombardier. Thus, the Plaintiffs lack standing as to the claims that do not sound in
breach of the Indenture and the AC must be dismissed without prejudice as to those
claims.
However, to the extent that the Plaintiffs requested leave to file a SAC, leave is
granted and the Plaintiffs shall file such SAC within 30 days of this decision and
order.
It is hereby ORDERED that the motion to dismiss the AC is granted without
prejudice; and it is further
ORDERED that a SAC shall be filed within 30 days of the date of today's order.
DATE 3/17/2023ANDREW BORROK, J.S.C.