Carey v Carmel Richmond Nursing Home, Inc (2024 NY Slip Op 51782(U))

[*1]

Carey v Carmel Richmond Nursing Home, Inc

2024 NY Slip Op 51782(U)

Decided on December 30, 2024

Supreme Court, Richmond County

Castorina, Jr., J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 30, 2024
Supreme Court, Richmond County

Paul Carey, as Administrator of the Estate of Portia Carey, Deceased, Plaintiff,

against
Carmel Richmond Nursing Home, Inc d/b/a Carmel Richmond Healthcare and Rehabilitation Center, Defendant.

Index No. 150419/2024

Attorney for the Plaintiff
Jonathan Joseph Panarella, Esq.
Krentsel & Guzman, LLP 
17 Battery Pl., Ste. 604
New York, NY 10004-1135 
Phone: (212) 227-2900 
E-mail: jpanarella@kglawteam.com
Attorneys for the Defendant
Joseph Duffy Furlong, Esq.
Barker Patterson Nichols, LLP 
300 Garden City Plaza Suite 100
Garden City, NY 11530 
Phone: (516) 282-3355
E-mail: j.furlong@bpn.law

Ronald Castorina, Jr., J.

The following e-filed documents listed on NYSCEF (Motion #001) numbered 10-101 were read on this motion.
Upon the foregoing documents, and after oral argument completed on November 7, 2024, on Motion Sequence #001, Motion Sequence #001 is resolved and therefore, it is hereby,
ORDERED, that the Defendants' request for dismissal of Plaintiff's complaint pursuant to CPLR § 3211 [a] [7] upon the ground that Defendant is immune from liability under New [*2]York's Emergency or Disaster Treatment Protection Act, NY Pub. Health Law §§ 3080-82 is DENIED with prejudice; and it is further,
ORDERED, that the Defendants' request for the dismissal of the complaint pursuant to CPLR § 3211 [a] [2] and CPLR § 3211 [a] [7] on the ground that Defendant is immune from suit and liability under the federal Public Readiness and Emergency Preparedness Act, 42 U.S.C. § 247d-6d, et seq, and the court thus lacks subject matter jurisdiction is DENIED with prejudice; and it is further,
ORDERED, that counsel shall appear for a conference on the next appearance date of January 15, 2025, at 9:30 AM, at the Courthouse located at 26 Central Avenue, Courtroom 330, Staten Island, NY; and it is further,
ORDERED, that the Clerk of the Court shall enter judgment accordingly.
 Memorandum Decision

 I. Procedural History
On or about February 28, 2024, Plaintiff, as Administrator of the Estate of the Decedent, Portia Carey, commenced this action to recover for alleged instances of willful, intentional, reckless, and grossly negligent acts and omissions that occurred leading up to and during Plaintiff-Decedent's admission to Defendant's facility from on or about March 1, 2020, through on or about May 6, 2020.
Defendant filed Motion Sequence #001 on June 11, 2024, seeking (a) dismissal of Plaintiff's complaint pursuant to CPLR § 3211 [a] [7] upon the ground that Defendant is immune from liability under New York's Emergency or Disaster Treatment Protection Act, NY Pub. Health Law §§ 3080-82; and (b) dismissal of the complaint pursuant to CPLR § 3211 [a] [2] and CPLR § 3211 [a] [7] on the ground that Defendant is immune from suit and liability under the federal Public Readiness and Emergency Preparedness Act, 42 U.S.C. § 247d-6d, et seq.
On October 17, 2024, Plaintiff filed opposition to Motion Sequence #001. Defendant filed reply on October 21, 2024. Oral argument was heard on November 7, 2024. 

II. Facts
Plaintiff Paul Carey is the son of Portia Carey (Resident) and administrator of her estate. Defendant is a residential healthcare facility located in Staten Island, New York. In late January 2020, COV1D-19 was declared a global health emergency by the World Health Organization. (see Murray v Staten Is. Care Ctr., 2024 NYMisc. LEXIS 1605 [Sup Ct Richmond County 2024]). On March 2, 2020, New York State declared a State Disaster Emergency due to COV1D-19. (see id).
On or about March 4, 2020, through the date of her death, May 6, 2020, Resident was admitted to Defendant's facility (NY St Cts Filing [NYSCEF] Doc No. 15). On March 31, 2020, 27 days after her admission, there was a suspicion of COVID-19. (see id). According to a Nursing note, Resident was not in any distress, there was no shortness of breath (SOB), however her temperature, which was taken regularly as of March 29, 2020, was 99.8. (see id). Resident's temperature was 98.3 when it was retaken later by Patience Akoto, LPN. On April 2, 2020, Resident was diagnosed with COVID-19. (see id).
According to a note by Dr. Mandic, the attending physician, she [Resident] was in poor condition. It was specifically noted, by Dr. Mandic, that her [Resident's] physical decline was unrelated to COVID-19. In fact, she [Resident] was noted to be negative for COVID-19 on May 1, 2020[.] At this time Ms. Carey [Resident] was on comfort measures only. [*3]On May 6, 2020 at 12:45 AM she [Resident] was noted to have no vital signs and was pronounced dead. (see id).
Plaintiff alleges that due to Defendant's abject and longstanding failure to maintain a system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, volunteers, visitors, and other individuals, and Defendant's failure to adequately care for and protect its elderly and vulnerable residents led to the death of the Resident from COVID-19 (known colloquially as the "coronavirus") infection on May 6, 2020. (NY St Cts Filing [NYSCEF] Doc No. 16).
Plaintiff contends that prior to the arrival of coronavirus, specifically between October 17, 2016, through January 19, 2021, Defendant was cited by government inspectors and regulators 4 times including for failing to provide and implement an infection prevention and control program. (see id). Plaintiff further contends that according to the Center for Medicare Services, Defendant had a below average staffing rating. (see id).
Plaintiff maintains that prior to the coronavirus emergency in New York, on February 6, 2020, Defendant was placed on notice by Centers for Medicare and Medicaid Services that coronavirus infections can rapidly appear and spread, and that it was critical that the nursing home be prepared by planning for infectious and diseases response, including having sufficient personal protective equipment (PPE) available. (see id).
Plaintiff further maintains Defendant failed to take proper precautions to help prevent the development of infections prior to and leading up to the COVID-19 pandemic. (see id).
Plaintiff contends that Resident's injuries were substantially contributed to by the negligent acts and/or omissions, willful and intentional criminal misconduct, gross negligence, reckless misconduct and intentional infliction of harm of the Defendants as well as the violation of the resident's rights pursuant to New York Public Health Law § 2801-d. (see id).
Plaintiff maintains that the Resident's COVID-19 infection, was caused, or contributed to by Defendant's infection control policies, and/or Defendant's acts or omissions related to Defendant's infection control policies. Plaintiff alleges in their complaint that Resident's death was the direct result of Defendant's negligent acts and/or omissions, willful and wanton acts, gross negligence, reckless misconduct, which was a circumstance that existed prior to the COVID-19 pandemic.

 III. Emergency or Disaster Treatment Protection Act
CPLR § 3211 [a] [7] provides that a "party may move for judgment dismissing one or more causes of action asserted against him on the ground that the pleading fails to state a cause of action[.]" "In considering a motion pursuant to CPLR 3211 [a] [7] to dismiss a complaint for failure to state a cause of action, the court must accept the facts as alleged in the complaint as true, accord the plaintiff the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (see Green 333 Corp. v RNL Life Science, Inc., 186 AD3d 1334 [2d Dept 2020] citing Cortlandt St. Recovery Corp. v Bonderman, 31 NY3d 30 [2018]; Korsinsky v Rose, 120 AD3d 1307 [2d Dept 2014]).
Where "evidentiary material is submitted and considered on a motion pursuant to CPLR § 3211 [a] [7], and the motion is not converted into one for summary judgment, the question becomes whether the plaintiff has a cause of action, not whether the plaintiff has stated one, and unless it has been shown that a material fact claimed by the plaintiff to be one is not a fact at all, and unless it can be said that no significant dispute exists regarding it, dismissal should not eventuate" (see Graphic Arts Mut. Ins. Co. v Pine Bush Cent. Sch. Dist., 159 AD3d 769 [2d Dept [*4]2018] citing Guggenheimer v. Ginzburg, 43 NY2d 268 [1977]; Sposato v Paboojian, 110 AD3d 979 [2d Dept 2013]; Constructamax, Inc. v Dodge Chamberlin Luzine Weber, Assoc. Architects, LLP, 109 AD3d 574 [2d Dept 2013]).
"A court is, of course, permitted to consider evidentiary material submitted by a defendant in support of a motion to dismiss pursuant to CPLR § 3211 [a] [7]" (see Mera v. New York City Health & Hosps. Corp., 2023 NY App Div LEXIS 4951 [2d Dept 2023] quoting Cordell Marble Falls, LLC v Kelly, 191 AD3d 760 [2d Dept 2021] quoting Sokol v Leader, 74 AD3d 1180 [2d Dept 2010] citing CPLR § 3211 [c]).
"If the court considers evidentiary material, the criterion then becomes 'whether the proponent of the pleading has a cause of action, not whether he [or she] has stated one'" (see id quoting Sokol v Leader, 74 AD3d 1180 [2d Dept 2010] quoting Guggenheimer v. Ginzburg, 43 NY2d 268 [1977] citing Cordell Marble Falls, LLC v Kelly, 191 AD3d 760 [2d Dept 2021]).
At the outset of the COVID-19 pandemic the New York State Legislature enacted the Emergency or Disaster Treatment Protection Act (Public Health Law former art 30-D, §§ 3080-3082 [repealed by L 2021, ch 96, § 1]; hereinafter the EDTPA) with the stated purpose of "promot[ing] the public health, safety and welfare of all citizens by broadly protecting the health care facilities and health care professionals in this state from liability that may result from treatment of individuals with COVID-19 under conditions resulting from circumstances associated with the public health emergency" (see id quoting Public Health Law former § 3080).
[T]he EDTPA initially provided, with certain exceptions, that a health care facility "shall have immunity from any liability, civil or criminal, for any harm or damages alleged to have been sustained as a result of an act or omission in the course of arranging for or providing health care services" as long as three conditions were met: [1] the services were arranged for or provided pursuant to a COVID-19 emergency rule or otherwise in accordance with applicable law; [2] the act or omission was impacted by decisions or activities that were in response to or as a result of the COVID-19 outbreak and in support of the State's directives; and [3] the services were arranged or provided in good faith (see id quoting former PHL § 3082 [1]).
The health care services covered by the immunity provision included those related to the diagnosis, prevention, or treatment of COVID-19; the assessment or care of an individual with a confirmed or suspected case of COVID-19; and the care of any other individual who presented at a health care facility or to a health care professional during the period of the COVID-19 emergency declaration (see id former PHL § 3081 [5]).
The only exception under the statute is for injuries caused by "willful or intentional criminal misconduct, gross negligence, reckless misconduct, or intentional infliction of harm" (see former PHL § 3082 [2]).
The "Court of Appeals has held that the failure to exercise even 'slight care' or 'slight diligence' constitutes gross negligence (see Gentile v. Garden City Alarm Co., 147 AD2d 124 [2d Dept 1989] citing Food Pageant, Inc. v. Consolidated Edison Co., 54 NY2d 167 [1981]; Dalton v. Hamilton Hotel Operating Co., 242 NY. 481 [1926]; Weld v. Postal Tel. Cable Co., 210 NY 59 [1913]). "To constitute gross negligence, a party's conduct must 'smack[ ] of intentional wrongdoing' or 'evince[ ] a reckless indifference to the rights of others'" (see Bennett v State Farm Fire & Cas. Co., 161 AD3d 926 [2d Dept] quoting Ryan v IM Kapco, Inc., 88 AD3d 682 [2d Dept 2011] quoting Sommer v. Federal Signal Corp., 79 NY2d 540 [1992]; citing Skywest, Inc. v Ground Handling, Inc., 150 AD3d 922 [2d Dept 2017]; J. Petrocelli Contr., Inc. [*5]v Morganti Group, Inc., 137 AD3d 1082 [2d Dept 2016]).
"Generally, the question of gross negligence is a matter to be determined by the trier of fact" (see id citing Food Pageant, Inc. v. Consolidated Edison Co., 54 NY2d 167 [1981]; Dolphin Holdings, Ltd. v Gander & White Shipping, Inc., 122 AD3d 901 [2d Dept 2014]).
On or about March 4, 2020, through the date of her death, May 6, 2020, Resident was admitted to Defendant's facility (NY St Cts Filing [NYSCEF] Doc No. 15).
Plaintiff contends that Resident was exposed, infected and contracted COVID-19 while a resident at Defendant's facility, her medical chart does not explain the circumstances under which Resident was exposed to the infection, and pertinent parts of Resident's care, and eventual illness, were omitted from the self-prepared records of the Defendant. (NY St Cts Filing [NYSCEF] Doc No. 76).
Plaintiff maintains in his complaint that Defendant was required by New York and Federal regulations to
maintain an infection control designed to provide a safe, sanitary, and comfortable environment in which residents reside and to help prevent the development and transmission of disease and infection, in which residents reside and to help prevent the development and transmission of diseases and infections, investigates, controls and takes actions to prevent infections in the facility and determines what procedures such as isolation and universal precautions should be utilized for an individual resident and implements the appropriate procedures. (NY St Cts Filing [NYSCEF] Doc No. 16).
and "maintain a sufficient Infection Prevention and Control Program, and that the facility maintains and utilizes sufficient Personal Protective Equipment (PPE), including gloves, gowns and masks." (see id).
In her affidavit in support of the Defendant Mary Beth Francis, RN, MS, LNHA, contends,
In a direct effort to prevent the introduction of COVID-19 to Carmel [Defendant's facility] and thus to protect [Resident], starting in mid-February 2020 and continuing daily at all relevant times, [Defendant] held daily, system-wide COVID-19 meetings that were attended by multidisciplinary teams and professionals throughout the system. These meetings served to allocate resources, review data, address COVID-19 issues in the system and keep abreast of Federal and New York State (NYS) guidelines. Infection control policies were developed and/or revised based on the daily guidance and directives from the CDC and NYS Department of Health. These policies were put in place to protect residents and staff, such as [Resident] and thus directly impacted her care.
Carmel enacted numerous measures in response to the pandemic to prevent the spread of COVID-19 within the facility and protect residents and staff. These included the following:
a. Carmel enacted a policy entitled COVID-19 System Wide Policy and Procedures Disease Preparedness, whose purpose was to provide all ArchCare entities with instructions and guidance on managing, monitoring and educating the patients, staff and visitors about COVID-19 so they could help prevent its spread, identify potential COVID-19 cases, and ensure facilities had adequate staff and supplies to address a potential pandemic;
b. Carmel designated a COVID-19 liaison that was tasked with coordinating educational programs for residents, visitors, and staff and ensuring facility compliance with infection [*6]control policies;
c. Carmel activated its Disaster Preparedness Plan; This consisted of vaccinations; hand hygiene; respiratory etiquette and early testing if a resident was exposed or symptomatic.
d. Carmel designated rooms for the isolation of Persons Under Investigation for COVID-19 ("PUI's") and COVID-19 positive patients;
e. Carmel screened visitors for signs and symptoms of COVID-19 prior to entry to the building;
f. Carmel screened residents for respiratory and flu-like symptoms, including Ms. Carey;
g. Carmel cancelled group activities for all residents, including Ms. Carey;
h. Carmel assigned Infection Control Monitors with specific surveillance duties;
i. Carmel enhanced cleaning procedures to minimize the risk of COVID-19 transmission via contaminated surfaces;
j. Carmel maintained social distancing between residents and staff when possible;
k. Carmel screened employees for signs and symptoms of COVID-19 at the start of their shifts;
1. In-person Mass was cancelled for all residents, including Ms. Carey;
m. Visitation was restricted and ultimately banned, consistent with state directives;
n. Carmel instituted a requirement that hospitals transferring patients to Carmel must provide a letter stating the patient was free from communicable disease before they could admit them. This process was intended to reduce the risk of admitting a COVID-19 positive patient, and
o. Communal dining was closed for all residents. (NY St Cts Filing [NYSCEF] Doc No. 14).
Defendants provide a copy of these protocols as Defendant's Exhibit E. (NY St Cts Filing [NYSCEF] Doc No. 17). These protocols are entitled "COVID-19 System Wide Policy and Procedures Disease Preparedness" and have an "effective date" of February 20, 2020, and a "most recent revision date" of March 24, 2020. (see id). There is no indication as to what the original "COVID-19 System Wide Policy and Procedures Disease Preparedness" protocols were as issued on February 20, 2020, as compared to the revised protocols that were provided and effective on March 24, 2020, some twenty days after the resident was admitted and some twelve days prior to her diagnosis with COVID-19.
In his affidavit in support of the Defendant, Miguel Tirado, MD, Resident was admitted into Defendant's facility on March 4, 2020, "with a diagnosis of localization-related idiopathic epilepsy and epileptic syndromes with seizures of localized onset, intractable, with status epilepticus; She had acute on chronic diastolic (congestive) heart failure; anemia; and chronic ischemic heart disease." (NY St Cts Filing [NYSCEF] Doc No. 15). While Resident suffered from various maladies upon admission, there is no indication in Dr. Tirado's affidavit that the Resident had COVID-19 nor was exhibiting any COVID-19 symptoms.
"On March 29, 2020, an order was entered that [Resident's] temperature was to be monitored on each shift." (see id at page 3). On March 29, 2020, Resident was seen by Dr. Tirado because she was coughing up blood. (see id). Dr. Tirado provided that "On exam, I found her lungs to be clear to auscultation and that her congestive heart failure was stable. Almost 3 hours later she was noted with an occasional cough. [] There was no chest congestion, shortness of breath (SOB), or fever. She was to be monitored." (see id).
Dr. Tirado further provided,
On March 31, 2020, 27 days after her admission, there was a suspicion of COVID-19. [] According to a Nursing note, she was not in any distress, there was no SOB, however her temperature, which was taken regularly as of March 29, 2020, was 99.8. Resident was seen by Dr. Mandic, according to the chart, who ordered a CBC, CMP, blood cultures x 2, lactic acid levels and COVID-19 tests. Her temperature was 98.3 when it was retaken later by Patience Akoto, LPN. (see id).
On April 2, 2020, she was diagnosed with COVID-19 and treatment commenced. (see id).
Dr. Tirado notes that Resident was negative for COVID-19 on May 1, 2020, and had been free from fever since April 4, 2020. (see id at page 4). On May 6, 2020, at 12:45 AM, Resident was noted to have no vital signs and was pronounced dead. (see id).
"On a motion to dismiss a complaint pursuant to CPLR § 3211 [a] [7] for failure to state a cause of action, the complaint is to be afforded a liberal construction, the facts alleged are presumed to be true, the plaintiff is afforded the benefit of every favorable inference, and the court is to determine only whether the facts as alleged fit within any cognizable legal theory" (see Martinez v. NYC Health & Hosps. Corp., 223 AD3d 731 [2d Dept 2024] quoting Watts v City of New York, 186 AD3d 1577 [2d Dept 2020]; citing CPLR § 3026; Leon v Martinez, 84 NY2d 83 [1994]).
In Martinez, the plaintiff alleged that the decedent was diagnosed with COVID-19 after arriving at the hospital on March 30, 2020, and he died from COVID-19 on April 9, 2020. (see id). The defendants' submissions in Martinez, included the complaint and the transcript of the plaintiff's hearing pursuant to General Municipal Law § 50-h, and conclusively established that the defendants were entitled to immunity under the EDTPA (see id citing Public Health Law former § 3082; Mera v New York City Health & Hosps. Corp., 220 AD3d 668 [2d Dept 2023]; Ruth v. Elderwood At Amherst, 209 AD3d 1281 [4th Dept 2022]).
The Second Department held that as the complaint in Martinez made "no allegations that the defendants' acts or omissions constituted willful or intentional criminal misconduct, gross negligence, reckless misconduct, or intentional infliction of harm, none of the exceptions to the immunity provisions of EDTPA apply" (see id citing Public Health Law former § 3082 [2]).
Plaintiff contends that prior to the arrival of coronavirus, Defendant had a longstanding history of failing to provide proper infection prevention and control procedures, and despite being armed with knowledge of prior public health infection events, failed to take steps to prepare to prevent the spread of future infections. (NY St Cts Filing [NYSCEF] Doc No. 16).
Plaintiff further contends that Defendant failed to maintain adequate staffing and failed to have appropriate staffing to patient ratios prior to the COVID-19 pandemic and as a consequence, Defendant was forced to negligently and recklessly cause COVID-19 positive staff to report to work and come into contact with residents. (see id).
Plaintiff maintains that Defendant willfully neglected to provide timely, consistent, safe, adequate, and appropriate services, treatment and/or care to a patient or resident of a residential health care facility in violation of state requirements and failed to maintain adequate quarantine facilities which led to an inability, during the pandemic, to appropriately and safely quarantine residents. (see id).
Plaintiff further maintains that Defendant failed to maintain an infection control program with policies designed to provide a safe, sanitary, and comfortable environment in which residents vulnerable to infection reside and where their health care providers work and failed to [*7]have an infection control program which investigated, controlled and took action to prevent infections in the facility and to determine what procedures, such as isolation, should be utilized for an individual resident to prevent continued transmission of disease. (see id).
Plaintiff contends that Defendant failed to isolate residents and properly sterilize and store all equipment to prevent the spread of infection and Defendant acted willfully, intentionally, recklessly and with gross negligence by knowingly by implementing policies, including accepting COVID-19 positive patients and residents, failing to test patients, residents, and staff, etc. with the knowledge that the policies implemented would increase the risk of contracting disease, causing sickness and death in patients and residents. (see id).
Plaintiff alleges that during the Resident's admission to Defendant's facility, Resident was infected with SARS-CoV-2 and COVID-19 causing Resident to sustain serious injury due to the negligent acts or omissions of the Defendant, resulting in severe and permanent personal injuries, and the untimely death. (see id).
Neither the Defendant's affidavits from Mary Beth Francis, RN, MS, LNHA nor Miguel Tirado, MD address the Plaintiff's allegation of inadequacy of the Defendant facility's pre-pandemic staffing levels. ((NY St Cts Filing [NYSCEF] Doc Nos. 14; 15). New York law imposes on nursing home operators a special obligation to care for their residents specifically as follows:
(1) New York's residential health care facilities are responsible for the health and well-being of more than 100,000 residents ranging from infants with multiple impairments to young adults suffering from the sequelae of traumatic brain injury to the frail elderly with chronic disabilities. For the vast majority of residents, the residential health care facility is their last home. A license to operate a nursing home carries with it a special obligation to the residents who depend upon the facility to meet every basic human need.
(2) Each resident comes to the nursing home with unique life experiences, values, attitudes and desires, and a singular combination of clinical and psychological needs. In order to assure the highest practicable quality of life, the individuality of the nursing home resident must be recognized, and the exercise of self-determination protected and promoted, by the operator and staff of the facility. The physical environment, care policies and staff behavior must at once acknowledge the dependence of the residents while fostering their highest possible level of independence. (see 10 NYCRR § 415.1 [a] [1]; [2])
Nursing homes are also required to maintain sufficient staffing to provide required care. (see 10 NYCRR § 415.13).
The omission from the Defendant's evidence regarding the adequacy of its staffing levels prior to and during the pandemic raises an issue of fact. If the Defendant did not have adequate healthy staff, it would have been a departure from good and accepted medical practice to continue to admit additional residents and not seek to transfer all residents that it could not safely and adequately care for. Decisions made by the Defendant, as to staffing, etc., would have impacted the care rendered to the Resident. Such decisions having been made prior to the pandemic and maintained during the crisis would defeat the intent of the EDTPA, which was enacted to support health care professionals making impossible heath care decisions in good faith during the unprecedented crisis.
Further questions of fact also remain as to what exactly the Defendant's protocols were, and when they were implemented in relation to the Resident's admission.
The "Court of Appeals has held that the failure to exercise even 'slight care' or 'slight diligence' constitutes gross negligence (see Gentile v. Garden City Alarm Co., 147 AD2d 124 [2d Dept 1989] citing Food Pageant, Inc. v. Consolidated Edison Co., 54 NY2d 167 [1981]; Dalton v. Hamilton Hotel Operating Co., 242 NY. 481 [1926]; Weld v. Postal Tel. Cable Co., 210 NY 59 [1913]). "To constitute gross negligence, a party's conduct must 'smack[ ] of intentional wrongdoing' or 'evince[ ] a reckless indifference to the rights of others'" (see Bennett v State Farm Fire & Cas. Co., 161 AD3d 926 [2d Dept] quoting Ryan v IM Kapco, Inc., 88 AD3d 682 [2d Dept 2011] quoting Sommer v. Federal Signal Corp., 79 NY2d 540 [1992]; citing Skywest, Inc. v Ground Handling, Inc., 150 AD3d 922 [2d Dept 2017]; J. Petrocelli Contr., Inc. v Morganti Group, Inc., 137 AD3d 1082 [2d Dept 2016]).
"Generally, the question of gross negligence is a matter to be determined by the trier of fact" (see id citing Food Pageant, Inc. v. Consolidated Edison Co., 54 NY2d 167 [1981]; Dolphin Holdings, Ltd. v Gander & White Shipping, Inc., 122 AD3d 901 [2d Dept 2014]).
In considering a motion pursuant to CPLR § 3211 [a] [1] and CPLR 3211 [a] [7], the court must accept the facts as alleged in the complaint as true, accord the plaintiff the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory, in doing so the complaint sets forth the requisite elements that would permit the trier of fact to determine whether the Defendants' conduct rose to the levels to constitute gross negligence, thus exempting the Defendants from the immunity under EDTPA.
Accordingly, Defendants' request for dismissal of Plaintiff's complaint pursuant to CPLR § 3211 [a] [7] upon the ground that Defendant is immune from liability under New York's Emergency or Disaster Treatment Protection Act, NY Pub. Health Law §§ 3080-82 is DENIED with prejudice.

IV. Public Readiness and Emergency Preparedness Act
The PREP Act was enacted in 2005 and is invoked when the Secretary of Health and Human Services determines that a disease or health condition exists that constitutes a public health emergency (42 USC § 247d-6d[b]). Thereafter, the Secretary "may make a Declaration through publication in the Federal Register, recommending ... the manufacture, testing, development, distribution, administration, or use of one or more covered countermeasures." This was done to address the COVID-19 pandemic (Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, (85 Fed Reg 15 198 [March 10, 2020]).
When enacting the PREP Act, which can cut off an injured individual's ability to seek recourse through the courts, Congress recognized the need to include an alternative form of relief for individuals injured by covered countermeasures. Under the PREP Act, a "covered countermeasure" is a drug, biological product, or device that is a "qualified pandemic or epidemic product" or a "security countermeasure" or is "authorized for emergency use by the Federal Food, Drug, and Cosmetic Act. The PREP Act does not define "administration" and "use," but the Secretary's Declaration states that "administration" of covered countermeasures "means physical provision of countermeasures to recipients, or activities and decisions directly relating to public and private delivery, distribution and dispensing of countermeasures to recipients, management and operation of countermeasure programs, or management and operation of locations for purpose of distributing and dispensing countermeasures." The PREP Act provides that "[s]ubject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss [*8]caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure." (see 42 USC § 247d-6d [a] [1]).
The immunity provided under the PREP Act "applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure." (see 42 USC § 247d-6d [a] [2] [B]). Immunity under the PREP Act applies to any loss or claim that has a causal relationship to the administration to or use by a "covered person" arising out of or relating to the administration of a covered countermeasure (42 USC § 247d-6d(a)(1), with the exception to immunity being "death or serious physical injury proximately caused by willful misconduct." A claim falling under the PREP Act must be filed in federal court, and the Act creates a fund known as the Covered Countermeasure Process Fund ("CCPF") for "purposes of providing timely, uniform, and adequate compensation to eligible individuals for covered injuries" (42 USC § 247d-6e[a]) (See Whitehead v Pinehead Operating, LLC, 75 Misc 3d 985 [Sup Ct Columbia County 2022]).
The only exception to the PREP Act's grant of immunity is "for death or serious physical injury proximately caused by willful misconduct" (see 42 USC § 247d-6d [d] [1]), defined as an act or omission that is taken (i) intentionally to achieve a wrongful purpose; (ii) knowingly without legal or factual justification; and (iii) in disregard of a known or obvious risk that is so great as to make it highly probable that the harm will outweigh the benefit (see 42 USC § 247d-6d [c] [1] [A]). Under 42 USC § 247d-6d(d)(1), immunity is not available when willful misconduct is the proximate cause of death or serious physical injury. Any such case must be brought in the District Court for the District of Columbia, no matter where the harm occurred. The burden of proving proximate cause is on the plaintiff. The standard is clear and convincing evidence. The advisory opinion notes that the PREP Act does not confer immunity against federal enforcement actions, whether civil, criminal, or administrative. For activities undertaken under a federal contract, the period of immunity lasts until October 1, 2024. Once the declaration expires, covered entities have 12 months of liability protection to dispose of Covered Countermeasures.
Here, Defendants contend that:
Covered countermeasures are broadly defined under the PREP Act Declaration to include, among other things, any drug, diagnostic, or other device that is approved, cleared, or licensed by the FDA and is used to diagnose, mitigate, prevent, treat, cure, or limit the harm of COVID-19. HHS has advised that the number of "covered countermeasures" are "too numerous to list" and include various forms of PPE, hand sanitizers, COVID-19 tests, oxygen and its delivery systems, and medical devices used for determining whether an individual is symptomatic for COVID-19, such as thermometers and pulse oximeters. Covered countermeasures also include medications to treat COVID-19 and its sequelae, such as the drug Hydroxychloroquine[.] (NY St Cts Filing [NYSCEF] Doc No. 12).
Defendants further contends that the administration of covered countermeasures includes not only the physical provision of a covered countermeasure, but also extends to activities and decisions directly relating to dispensing of countermeasures, and activities related to [*9]management and operation of programs and locations for providing countermeasures to recipients. (see id).
While Defendants argue that Plaintiff's claims involve Defendants' protocols for preventing COVID-19 which would include the use and administration of covered countermeasures, among the Plaintiff's claims for loss are claims arising from Defendants' alleged failure to implement an effective infection control program and effectively isolate persons exhibiting symptoms. Accepting the Plaintiff's facts as alleged in the complaint as true and according those facts the benefit of every possible favorable inference, these claims would fall outside the scope of the PREP Act and rendering any immunity provided by it inapplicable.
The Court further questions the Defendants' expansiveness of the term "covered countermeasure". Discovery would be the appropriate vehicle to determine (i) which "countermeasures" fall under these definitions, if these alleged "covered countermeasures" are at play in plaintiff's claims, and if so, whether these are countermeasures that would not have been manufactured, administered, used, designed, developed, modified, licensed, or procured but for the COVID-19 pandemic. All said, the PREP Act does not afford federal courts exclusive subject matter jurisdiction over what has been pled here as a state claim (Dupervil v Alliance Health Operations, LLC, 516 F.Supp 3d 238 [EDNY 2021]). It is important to note that the PREP Act is, at its core, an immunity statute; it does not create rights, duties, or obligations. See 42 USC § 247d-6d(a)(1). Accordingly, in providing immunity from suit to certain covered persons for certain types of claims, the PREP Act confers primary jurisdiction over most claims within its scope not to the federal courts but to the Secretary, who has the sole authority to administer and provide compensation from a "Covered Countermeasure Process Fund." See42 USC §§ 247d-6e(a), 247d-6e(b). Even with PREP Act claims involving "willful misconduct," which may be brought exclusively in the United States District Court for the District of Columbia, the plaintiff must first exhaust administrative remedies, and may elect to accept compensation from the Process Fund instead of filing suit in federal court [See 42 USC §§ 247d-6e(d)(1), 247d-6e(d)(5); see also 42 USC §§ 247d-6d(d)(1), 247d-6d(e)(1)]. Thus, except for one narrow exception, PREP Act claims cannot be brought in federal court.
Accordingly, the Defendants' request for the dismissal of the complaint pursuant to CPLR § 3211 [a] [2] and CPLR § 3211 [a] [7] on the ground that Defendant is immune from suit and liability under the federal Public Readiness and Emergency Preparedness Act, 42 USC § 247d-6d, et seq, and the court thus lacks subject matter jurisdiction as the cause of action is defensively preempted by federal law is DENIED with prejudice.
Decretal Paragraphs
ORDERED, that the Defendants' request for dismissal of Plaintiff's complaint pursuant to CPLR § 3211 [a] [7] upon the ground that Defendant is immune from liability under New York's Emergency or Disaster Treatment Protection Act, NY Pub. Health Law §§ 3080-82 is DENIED with prejudice; and it is further,
ORDERED, that the Defendants' request for the dismissal of the complaint pursuant to CPLR § 3211 [a] [2] and CPLR § 3211 [a] [7] on the ground that Defendant is immune from suit and liability under the federal Public Readiness and Emergency Preparedness Act, 42 USC § 247d-6d, et seq, and the court thus lacks subject matter jurisdiction is DENIED with prejudice; and it is further,
ORDERED, that counsel shall appear for a conference on the next appearance date of January 15, 2025, at 9:30 AM, at the Courthouse located at 26 Central Avenue, Courtroom 330, [*10]Staten Island, NY; and it is further,
ORDERED, that the Clerk of the Court shall enter judgment accordingly.
The foregoing shall constitute the Decision and Order of this Court. 
Dated: December 30, 2024
Staten Island, New York
E N T E R,
HON. RONALD CASTORINA, JR.
JUSTICE OF THE SUPREME COURT